OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 The New York City zoning laws prohibit continuation of a nonconforming use if, during a two-year period, "the active operation of substantially all the non-conforming uses * * * is discontinued” (New York City Zoning Resolution § 52-61). This case presents a novel question of statutory construction: what is the appropriate legal standard to determine whether a nonconforming use has been discontinued under the Zoning
 
 *415
 
 Resolution? Contrary to the trial court and Appellate Division, we conclude that substantial — rather than complete— discontinuation of the active, nonconforming activity forfeits the nonconforming use, and that the good faith of the owner is irrelevant to that determination.
 

 Here, the Board of Standards and Appeals (BSA) on the facts found minimal warehouse activity following the complete stoppage of operations for 20 months, which failed to preserve nonconforming use status, and it revoked the building permit allowing petitioner to maintain a nonconforming use on the premises. Because the BSA determination was supported by substantial evidence, we reverse the trial court and Appellate Division decisions reinstating the building permit.
 

 1. Facts
 

 At issue here is a portion of a 16-story building located at the northeast corner of Third Avenue and East 80th Street in Manhattan. Built in 1926, the entire premises were situated in a retail zoning district and, in compliance with the certificate of occupancy and applicable zoning regulation, served as a storage and warehouse facility. When Morgan Manhattan Storage and Warehouse Company purchased the building in 1956, it continued to use the structure exclusively as a warehouse.
 

 The 1961 New York City Zoning Resolution changed the neighborhood from a retail zoning district to residential districts overlaid with strips of commercial districts on the avenue (rather than street) blocks. As a result, that portion of the building on Third Avenue presently remains in a commercial (Cl-9) zoning district. The portion fronting on 80th Street, however, is now in a residential (R8B) zone. Because warehouse use is no longer permitted as of right in either the commercially or the residentially zoned areas (see, Zoning Resolution art II; §§ 32-00, 32-25), use of the building as a warehouse could continue under the Zoning Resolution only as a nonconforming use (see, Zoning Resolution §§ 12-10, 52-11).
 

 Morgan continued to use the building as a warehouse until August 1989, when it contracted to sell the premises to a real estate developer. At that time, Morgan emptied the building and for the next 20 months ceased all warehouse operations. The sale fell through, and in April 1991 Morgan transferred a limited amount of goods stored in its other warehouses to the 80th Street facility and assigned a property manager there, in an effort to resume nonconforming warehouse use and thereby maintain the value of its property.
 

 
 *416
 
 In June 1992, Chase Manhattan Bank acquired the premises from Morgan by way of deed in lieu of foreclosure. In response to a request by Chase for advice as to whether nonconforming warehouse use was permissible, the New York City Department of Buildings (DOB) issued an informal opinion that the nonconforming use at the premises had been re-established in April 1991 and could lawfully continue.
 

 Petitioner Toys "R” Us purchased the basement, first and second floors of the building from a subsidiary of Chase in March 1994. Three months later, petitioner filed an application with DOB to convert the purchased premises into a retail toy store. DOB approved the application and in September 1994 issued a building permit authorizing the conversion.
 

 The 38,000 square foot premises occupy both commercially and residentially zoned space. A toy store is permitted as of right in the commercially zoned portion of the premises on Third Avenue but not in the residentially zoned section fronting on 80th Street, which includes the building’s loading docks
 
 (see,
 
 Zoning Resolution art II; §§ 32-00, 32-15). The instant dispute arises out of the DOB authorization to develop and operate this latter segment of the property situated in the residential zoning district as a retail toy store — a nonconforming use.
 

 Respondent-intervenor "Neighbors-R-Us,” a coalition of neighborhood and block associations, objected to the building permit and sought its revocation. In October 1994, DOB denied the request. Respondent-intervenor then challenged the issuance of the building permit by way of an administrative appeal to the BSA. It urged that the nonconforming warehouse use had been discontinued during the two-year period from August 1989 to July 1991 and, therefore, the Zoning Resolution only allowed the property to be developed in furtherance of a permitted use.
 

 The BSA held public hearings during a five-month period concerning the nature and extent of warehouse operations during the period between April and July 1991 and conducted a site inspection of the building and the surrounding area.
 

 After reviewing hundreds of pages of documents and hearing testimony from all sides, the BSA, "based on the totality of the evidence presented,’’ found the warehouse activity between April and July 1991 minimal. Concluding that the Zoning Resolution did not require complete cessation of the nonconforming use as a precondition to termination, the BSA determined
 
 *417
 
 that the insignificant level of warehouse activity during that period failed to perpetuate the nonconforming warehouse use. Deeming Morgan’s clear intent to resume warehouse operations insufficient to preserve the nonconforming use, the BSA revoked petitioner’s building permit.
 

 Petitioner commenced a CPLR article 78 proceeding seeking to reinstate the permit. Supreme Court held that the storage of some goods in the warehouse during April to July 1991, coupled with the absence of any bad faith or fraud by Morgan, sufficiently continued the nonconforming use. It thus granted the petition and annulled the BSA determination, allowing petitioner to maintain a nonconforming retail use in the residentially zoned space.
 

 The Appellate Division affirmed, one Justice dissenting. Like the trial court, the Appellate Division applied a good-faith standard and concluded that the concededly minimal storage activity from April to July 1991 sufficed to preserve nonconforming use status under the Zoning Resolution. The Appellate Division granted leave to appeal to this Court, and we now reverse.
 

 2. Analysis
 

 A use of property that is no longer authorized due to rezoning, but lawfully existed prior to the enactment of the existing zoning ordinance, is a nonconforming use
 
 {see,
 
 1 Anderson’s American Law of Zoning § 6.01, at 481-482 [Young 4th ed];
 
 see also,
 
 Zoning Resolution § 12-10). Nonconforming uses are necessarily inconsistent with the land-use pattern established by an existing zoning scheme.
 

 Due to constitutional and fairness concerns regarding the undue financial hardship that immediate elimination of nonconforming uses would cause to property owners, however, courts and municipal legislators have adopted a "grudging tolerance” of such uses
 
 (Matter of Pelham Esplanade v Board of Trustees,
 
 77 NY2d 66, 71). The law nevertheless generally views nonconforming uses as detrimental to a zoning scheme, and the overriding public policy of zoning in New York State and elsewhere is aimed at their reasonable restriction and eventual elimination
 
 (Matter of Syracuse Aggregate Corp. v Weise,
 
 51 NY2d 278, 284;
 
 Matter of Harbison v City of Buffalo, 4
 
 NY2d 553, 559-560;
 
 see,
 
 1 Anderson’s American Law of Zoning §§ 6.06, 6.69, at 500, 695 [Young 4th ed]).
 

 This policy disfavoring nonconforming uses was expressly incorporated into New York City’s 1961 Zoning Resolution.
 
 *418
 
 The purposes of the Zoning Resolution were to encourage "the development of desirable residential, commercial, and manufacturing areas with appropriate groupings of compatible and related uses and thus to promote and to protect public health, safety, and general welfare” (Zoning Resolution § 51-00). Nonconforming uses, while generally allowed to continue
 
 (see,
 
 Zoning Resolution § 52-11), were considered antagonistic to those goals and thus "subject to certain limitations” (Zoning Resolution § 51-00). As explained in the Statement of Legislative Intent, "[t]he regulations governing non-conforming uses * * * are therefore adopted in order to provide a gradual remedy for existing undesirable conditions resulting from such incompatible non-conforming uses, which are detrimental to the achievement of such purposes”
 
 (id.).
 

 One such restriction placed on the perpetuation of nonconforming uses is contained in Zoning Resolution § 52-61, which provides for the elimination of any nonconforming use that is discontinued for two years. Under section 52-61:
 

 "If, for a continuous period of two years, * * * the active operation of substantially all the nonconforming uses in any building or other structure is discontinued, such land or building or other structure shall thereafter be used only for a conforming use. Intent to resume active operations shall not affect the foregoing” (emphasis omitted).
 

 Whether petitioner can use the residential portion of the premises at issue here for nonconforming toy store use depends on whether its predecessor, Morgan, discontinued its nonconforming warehouse operations for two years within the meaning of section 52-61. This Court has never considered the proper legal standard for determining when a nonconforming use is abandoned under this zoning ordinance. In revoking petitioner’s building permit, the BSA construed section 52-61 as requiring substantial discontinuation, rather than complete cessation, of the nonconforming use by the property owner for two consecutive years, irrespective of any intent to preserve nonconforming use status.
 

 The BSA, comprised of five experts in land use and planning, is the ultimate administrative authority charged with enforcing the Zoning Resolution
 
 (see,
 
 NY City Charter §§ 659, 666). Consequently, in questions relating to its expertise, the BSA’s interpretation of the statute’s terms must be "given great weight and judicial deference, so long as the interpretation is
 
 *419
 
 neither irrational, unreasonable nor inconsistent with the governing statute”
 
 (Matter of Trump-Equitable Fifth Ave. Co. v Gliedman,
 
 62 NY2d 539, 545;
 
 see, Appelbaum v Deutsch,
 
 66 NY2d 975, 977). Its determination, moreover, must be sustained if it has a rational basis and is supported by substantial evidence (see,
 
 Appelbaum v Deutsch,
 
 66 NY2d at 977,
 
 supra; Matter of Fuhst v Foley,
 
 45 NY2d 441, 444). Where, however, the question is one of pure legal interpretation of statutory terms, deference to the BSA is not required
 
 (see, Matter of Teachers Ins. & Annuity Assn. v City of New York,
 
 82 NY2d 35, 41-42).
 

 Here, we must resolve two questions. First, we must determine the appropriate legal standard for abandonment under Zoning Resolution § 52-61 — a pure legal question that does not mandate deference to the BSA. We must then decide whether the BSA’s conclusion that Morgan abandoned nonconforming warehouse use was supported by substantial evidence.
 

 (a) The Legal Standard Under Zoning Resolution § 52-61
 

 Petitioner argues that the relevant inquiry under Zoning Resolution § 52-61 is whether nonconforming operations have completely ceased, and that any nonconforming use — however minimal — precludes a finding of abandonment. The trial court and Appellate Division majority agreed, concluding that Morgan’s use of the premises for some actual warehouse activity sufficed to preserve the nonconforming use.
 

 According to petitioner, New York courts have uniformly required proof that the entire nonconforming use was discontinued as a precondition to termination. Petitioner points to
 
 Matter of Marzella v Munroe
 
 (69 NY2d 967) in support of this contention. In
 
 Marzella,
 
 the property owner used a parcel of land that had been rezoned to permit only one two-family structure to house four families in two dwellings. When one house remained vacant for 15 years, so that three families rather than four resided on the property, the local zoning board concluded that nonconforming use of the property for four families had been abandoned. This Court disagreed, finding insufficient evidence to establish that the
 
 entire
 
 nonconforming use had been abandoned
 
 (id.,
 
 at 968).
 

 In doing so, we explained that "[abandonment does not occur unless there has been a complete cessation of the nonconforming use”
 
 (id.,
 
 at 968). Notably, however, the local zoning ordinance in
 
 Marzella
 
 broadly prohibited resumption of any "nonconforming use which has been abandoned”
 
 (see,
 
 Village
 
 *420
 
 of Dobbs Ferry Code § 300-8IB). The term "abandoned” was not qualified in any way; the statute therefore gave no indication that anything less than complete discontinuation of the nonconforming use would suffice to surrender it.
 

 Similarly, in
 
 Town of Islip v P.B.S. Marina
 
 (133 AD2d 81), also relied upon by petitioner, the relevant zoning ordinance contained absolute terms, providing that "discontinuance of any non[-]conforming use for a period of one year or more terminates such non-conforming use.” The Appellate Division thus concluded that " 'discontinuance connotes a complete cessation * * * so that a minimal nonconforming function, of itself, would not constitute an abandonment’ ”
 
 (id,.,
 
 quoting
 
 Baml Realty v State of New York,
 
 35 AD2d 857). Indeed, in each of the cases cited by petitioner adopting the complete cessation standard, the statutes spoke exclusively in terms of discontinuance, failing to qualify that requirement in any way
 
 (see, e.g., Baml Realty v State of New York,
 
 35 AD2d 857, supra;
 
 City of Binghamton v Gartell,
 
 275 App Div 457, 459).
 

 Unlike the statutes in these prior cases, however, Zoning Resolution § 52-61 explicitly equates abandonment with something less than discontinuation of the entire nonconforming use. Section 52-61 specifically terminates any further nonconforming use when "the
 
 active
 
 operation of
 
 substantially all
 
 the non-conforming uses * * * is discontinued” for a continuous two-year period (emphasis added). To construe this statute as requiring the property owner to discontinue
 
 all
 
 nonconforming operations — as the courts below did — simply ignores the plain language of the ordinance requiring that the owner merely cease "substantially” all of the nonconforming use.
 
 [1]
 
 Allowing the slightest nonconforming function to preserve the nonconforming use, moreover, would eliminate the specific language requiring "active” operations to avoid termination.
 

 
 *421
 
 The carefully chosen words of section 52-61 thus impose a standard of substantial rather than complete cessation.
 
 [2]
 
 The language of the statute also contradicts the conclusion of both the trial court and Appellate Division that section 52-61 implicitly contains a good-faith standard, allowing nonconforming activity to continue upon a showing that a property owner, in the absence of bad faith or fraud, intended to resume nonconforming use.
 

 Generally, abandonment of a nonconforming use requires both an intent to relinquish and some overt act or failure to act, indicating that the owner neither claims nor retains any interest in the subject matter of the abandonment
 
 (see,
 
 1 Anderson’s American Law of Zoning § 6.65, at 678 [Young 4th ed]). In New York, however, the inclusion of a lapse period in the zoning provision removes the requirement of intent to abandon — discontinuance of nonconforming activity for the specified period constitutes an abandonment regardless of intent
 
 (see, Matter of Prudco Realty Corp. v Palermo,
 
 60 NY2d 656, 657-658).
 

 Zoning Resolution § 52-61 provides a specific lapse period— two years — thereby rendering the owner’s intent irrelevant to abandonment. Indeed, section 52-61 goes even one step further, expressly stating that "[i]ntent to resume active operations shall not affect” the determination whether a nonconforming use has been discontinued.
 

 Notwithstanding the unique language of this particular zoning provision, petitioner urges that section 52-61 must be interpreted in its favor as the landowner. To be sure, zoning restrictions, being in derogation of common-law property rights, should be strictly construed and any ambiguity resolved in favor of the property owner
 
 (see, Matter of Allen v Adami,
 
 39 NY2d 275, 277). Zoning Resolution § 52-61, however, is not ambiguous — its clear language prohibits additional nonconforming activity when "substantially all” of the "active” nonconforming operations are discontinued, and deems the owner’s intent irrelevant. Furthermore, public policy specifi
 
 *422
 
 cally supports termination of nonconforming uses, and the Zoning Resolution itself seeks to achieve "a gradual remedy” for "incompatible” nonconforming uses (Zoning Resolution § 51-00). As we have stated in a related context:
 

 "It has been said in New York that a zoning ordinance must be 'strictly construed’ in favor of the property owner * * * .By way of counterpoint, however, it has been said, with equal conviction, that the courts do not hesitate to give effect to restrictions on nonconforming uses * * *. It is because these restrictions flow from a strong policy favoring the eventual elimination of nonconforming uses”
 
 (Matter of Off Shore Rest. Corp. v Linden,
 
 30 NY2d 160, 164).
 

 Thus, the interpretation of section 52-61 adopted by the BSA and Appellate Division dissenter — requiring only substantial, rather than complete, discontinuation to terminate a nonconforming use, regardless of the owner’s good faith — gives effect to all of the ordinance’s terms
 
 (see, Matter of Bliss v Bliss,
 
 66 NY2d 382, 388-389 [courts must, where possible, give meaning and effect to every word of a statute]) and also comports with the policy underlying the Zoning Ordinance.
 

 The Appellate Division’s concern that anything less than complete cessation under section 52-61 will lead to arbitrary results warrants comment. Section 52-61 imposes an objective, not subjective, standard: substantial discontinuation of active, nonconforming operations. Stated otherwise, section 52-61 terminates a nonconforming use when only minimal nonconforming activity continues. Whether this standard has been satisfied will, of course, turn on the peculiar facts of each case. All zoning cases are by their nature fact specific, and as a leading authority recognizes, the right to a nonconforming use must necessarily be decided "on a case-by-case basis” (1 Anderson’s American Law of Zoning § 6.23, at 553 [Young 4th ed]). Certainly, the DOB and BSA, comprised of qualified experts, are capable of making these determinations.
 

 (b) Application of the Legal Standard to the Facts
 

 It is undisputed that Morgan’s warehouse use from 1961 to August 1989 was permitted as a nonconforming use, and that
 
 Morgan
 
 completely ceased all nonconforming warehouse operations for 20 months between August 1989 and April 1991. The only question before the courts below and this Court is whether
 
 *423
 
 Morgan’s warehouse activity during the four-month period from April to July 1991 sufficed to preserve nonconforming use status under Zoning Resolution § 52-61. If not, petitioner is prohibited from operating a nonconforming retail toy store in the residentially zoned portion of the subject premises. Either way, of course, petitioner’s store may be developed in that segment of the property situated in a commercial zoning district, where a toy store is permitted as of right.
 

 The BSA’s determination that Morgan substantially discontinued nonconforming warehouse use of the property for 24 months must be confirmed if it has a rational basis and is supported by substantial evidence
 
 (Matter of Cowan v Kern,
 
 41 NY2d 591, 598). And where substantial evidence exists, a reviewing court may not substitute its judgment for that of the BSA — even if the court might have decided the matter differently
 
 (Matter of Cowan v Kern,
 
 41 NY2d at 599,
 
 supra; Matter of Collins v Codd,
 
 38 NY2d 269, 270). In reaching its conclusion, moreover, the BSA had de novo review power and was not bound by the findings of the DOB
 
 (see,
 
 Zoning Resolution § 72-11).
 

 The BSA’s review of warehouse logs for the contested four-month period revealed only eight customer accounts, compared to the 1,500 accounts previously maintained by the company. It further revealed that approximately 19 crates were shipped to the warehouse at that time, which would have occupied only one-tenth of one percent of the entire volume of the building. This extremely low level of activity was corroborated by testimony of the following: an Enviropact employee who, after examining every lobby floor and 75% of the storage lockers, saw only 12 to 15 crates and a few cardboard files; a Chase loan officer who walked through the building and observed about 20 large storage crates; various neighborhood residents who noticed that the building was vacant and unused; and a local real estate agent who found the warehouse to be completely empty, unheated, unlit and infested with pigeons. Based on this evidence, the BSA rejected the testimony of Morgan’s president, Jeffrey Morgan, that five percent of the building was used to maintain 40 to 50 customer accounts from April to July 1991.
 

 The BSA’s conclusion, however, was premised on more than the drastic reduction in the volume of storage activity. The BSA specifically noted the absence of any standard evidence for the critical four-month period typically available to document a legitimate business operation, such as insurance rec
 
 *424
 
 ords, tax documents, advertisements, liability coverage, customer records, employee records, certain directory listings, telephone records or sales receipts. Jeffrey Morgan even acknowledged that the company failed to renew the requisite Department of Consumer Affairs license after it expired in April 1991.
 

 The BSA thus properly considered objective factors regarding the nature and degree of nonconforming warehouse use, and its determination that Morgan’s level of warehouse operations from April to July 1991 was too insignificant to preserve nonconforming use status under section 52-61 was supported by substantial evidence. That conflicting inferences may have been drawn from this evidence is of no moment. "[T]he duty of weighing the evidence and making the choice rests solely upon the [administrative agency]. The courts may not weigh the evidence or reject the choice made by [such agency] where the evidence is conflicting and room for choice exists”
 
 (Matter of Stork Rest. v Boland, 282 NY 256, 267).
 

 Finally, petitioner’s contention that the BSA departed from its own precedent is unavailing. In
 
 Matter of 4702/4712 Clarendon Rd., Brooklyn
 
 (BSA Resolution, Mar. 23, 1993), the question was also whether nonconforming commercial operations were abandoned under Zoning Resolution § 52-61. After reviewing various business records attesting to the continuous commercial use of the property, the BSA determined that the active operation of substantially all the nonconforming use at the premises had not been discontinued for two years. In reaching the opposite conclusion here, the BSA noted the failure to produce similar business documents.
 
 Clarendon,
 
 therefore, is not inconsistent with the instant case.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the petition dismissed.
 

 Judges Simons, Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order reversed, etc.
 

 [1]
 

 . Tellingly, the drafters of section 52-61 rejected a proposed termination provision that omitted the qualifying language "substantially all.” In a Zoning Resolution submitted to the City Planning Commission pursuant to a contract with the City of New York, a special planning staff of architects suggested the following regarding termination of nonconforming uses: "If a non-conforming use
 
 discontinues active or continuous operations
 
 for a continuous period of one year, the building or other structure or tract of land where such non-conforming use previously existed shall thereafter be occupied and used only for a conforming use. Intent to resume active operations shall not affect the foregoing” (Voorhees, Walker, Smith and Smith, Report to NY City Planning Commn, Proposed Zoning Resolution § 51-31 [Aug. 1958] [emphasis added]).
 

 [2]
 

 . Petitioner alternatively urges that, because section 52-61 refers to discontinuation of "substantially all the non-conforming
 
 uses”
 
 — emphasizing the plural "uses” — discontinuation should be measured by whether a majority of the number of nonconforming uses is maintained, regardless of the level of activity devoted to each use. Petitioner, however, overlooks the basic rule of statutory construction that "[wjords in the singular number include the plural, and in the plural number include the singular” (General Construction Law § 35).