Bellacosa, J.
(dissenting). Petitioner Rudolf Steiner Fellowship Foundation should have the right to complete a proposed modification on its property in accordance with the vested rights it enjoys as a result of its prior, long-standing nonconforming use. I believe that the lower courts correctly annulled appellant Chestnut Ridge Village Zoning Board’s denial of relief to the petitioner, by ruling that the proposed alteration is within the permissible parameters of the existing nonconforming uses of the premises and does not violate applicable land use planning principles. Thus, I respectfully dissent from the reversal of the Appellate Division order.
In order to fully appreciate the evolution of the present dispute and the nature and extent of the Foundation’s vested rights, a review of the development and operation of the affected property is helpful. The Foundation is a not-for-profit charitable organization which was formed to operate an inter-generational community for the care of the elderly. Under its community concept, begun in 1966, elderly members have lived in a residential setting, usually with their younger caretakers, known as "co-workers.” The community is made up of multiple-use buildings which house the elderly residents, co-workers and their families, as well as various common activity areas. The Foundation thus provides its elderly residents with a uniquely interactive and diverse lifestyle, compared to more traditional institutional settings in which elder care is offered.
*462 In 1963, the Foundation purchased approximately 32 acres of property in the Town of Ramapo and applied to its Zoning Board of Appeals for a Special Permit for "[u]se of these premises for residences for the aged with adjunct services and facilities” in furtherance of its mission (emphasis added). On August 27, 1963, that Zoning Board granted the Special Permit for "convalescent and nursing homes and homes for the aged,” but further stated that "the Board cannot make an interpretation of the zoning ordinance due to the lack of detailed information in the presentation.” As noted by Supreme Court, however, the Town of Ramapo on at least seven occasions between 1967 and 1981 approved the construction of multiple-use buildings on the Foundation’s property without ever requiring a use variance. In 1986, the Village of Chestnut Ridge was carved out of the Town. The new Village encompassed the Foundation’s property within its boundaries. The Village’s Zoning Ordinance designated the Foundation’s property to be in a residential zone.
The present dispute concerns only the Foundation’s proposed modifications within its existing Building 10. No new building or even extensions are involved. Building 10 was erected prior to the existence of any zoning ordinance, and in 1970, was renovated to include one apartment for a co-worker family and other activity areas.
Most recently, the Foundation applied to the Zoning Board of Appeals of the Village of Chestnut Ridge (Village Board) for a use and area variance. It wanted to convert storage space within the building into a second apartment for another coworker family and make other modifications which are not pertinent in this proceeding. The Board granted the area variances, but denied the request for the use variance for the second apartment conversion. Importantly, the particular variation which was rejected by the Village Board was wholly within Building 10 and did not increase either the bulk or otherwise change the external structure of the building. The Foundation sued for relief in this CPLR article 78 proceeding.
Because both parties agree that the Foundation’s property fails to comply with the Village Zoning Law (Zoning Law of the Village of Chestnut Ridge, art XIII, § 1), the sole legal issue that has emerged is whether the proposed second apartment conversion in Building 10 qualifies as a continuation of the prior nonconforming use that would allow the Foundation, on a vested right basis, to complete the proposed alteration of Building 10. The resolution of this question should turn on *463 whether the Foundation’s "use” of its property in the unique circumstances and context presented by the Foundation’s elder care mission fits within an application of standard, extant precedential principles.
"It is the law of this state that nonconforming uses or structures, in existence when a zoning ordinance is enacted, are, as a general rule, constitutionally protected and will be permitted to continue, notwithstanding the contrary provisions of the ordinance” (People v Miller, 304 NY 105, 107; Matter of Ellington Constr. Corp. v Zoning Bd. of Appeals, 77 NY2d 114, 122; see generally, 1 Anderson, American Law of Zoning § 6.06, at 495-496 [Young 4th ed]). An important limitation on this rule is that "courts have accepted municipal land use legislation imposing reasonable restrictions against reestablishing nonconforming uses” after the use is abandoned or otherwise terminated (Matter of Pelham Esplanade v Board of Trustees, 77 NY2d 66, 70; see, Matter of Toys "R” Us v Silva, 89 NY2d 411, 417).
Appellant Village Board argues that because nonconforming uses are detrimental to the policies underlying comprehensive zoning they are legislatively and judicially disfavored (see, Matter of Toys "R” Us v Silva, supra, 89 NY2d, at 417; Matter of Harbison v City of Buffalo, 4 NY2d 553, 559-560). From this generally incontrovertible premise, it asserts that such uses are "grudging[ly] tolera[ted]” and narrowly construed with a view to their eventual elimination — again, a parallel generality that still depends on particularized application (Matter of Pelham Esplanade v Board of Trustees, supra, 77 NY2d, at 71; Matter of Toys ”R” Us v Silva, supra, 89 NY2d, at 417). Importantly, it is also fair to observe that courts strive to see that "the public interest in eliminating nonconforming uses at a legally opportunistic time is placed in reasonable balance with the owner’s interest in not having a property investment [or use] abruptly altered or terminated” (Matter of Pelham Esplanade v Board of Trustees, supra, 77 NY2d, at 72 [emphasis added]).
This Court has singularly balanced these competing policies by requiring that property owners claiming a right to continue a nonconforming use establish that the property was indeed used for the nonconforming purpose (see, Matter of Syracuse Aggregate Corp. v Weise, 51 NY2d 278, 284). Thus, this Court stated that "[t]he test most often employed in determining the extent of a nonconforming use is '* * * the nature of the incipient nonconforming use, in the light of the character and *464 adaptability to such use of the entire parcel’ * * *. Application of this standard necessarily entails an examination of the nature of the particular nonconforming use in issue as well as the activities engaged in by the landowner in effectuating that use prior to the adoption of the restrictive ordinance” (id., at 285 [quoting Matter of Fairmeadows Mobile Vil. v Shaw, 16 AD2d 137, 142]). The Court particularly determined that the owner of a soil and gravel extracting facility had acquired vested rights to quarry the entirety of a parcel although only a limited portion of the property had been excavated at the time the zoning ordinance was adopted (Matter of Syracuse Aggregate Corp. v Weise, supra, 51 NY2d, at 282). The Court held that "quarrying, as a nonconforming use, cannot be limited to the land actually excavated at the time of enactment of the restrictive ordinance because to do so would, in effect, deprive the landowner of his use of the property as a quarry” (id., at 286 [citations omitted]).
The majority, by upholding the position of the Village Board here, would significantly diminish the land use planning balance wheel of Syracuse Aggregate by excluding it from appropriate consideration in the present or comparable circumstances different from gravel pit use. This approach minimizes the wider import of Syracuse Aggregate, despite the gradual depletion of use feature of the rationale. Other guiding precedents from this Court dealing with the compensating features attendant upon the continuing nonconforming use doctrine are also pertinent to a complete assessment of the import of this case.
In Syracuse Aggregate, this Court did not create a "quarry exception” to the continuing nonconforming use doctrine, but instead applied the landowner protective principle in the context of the realistically lessened available use at issue there. Thus, recognizing that "quarrying involves a unique use of land” the Court noted that "as a matter of practicality as well as economic necessity, a quarry operator will not excavate his entire parcel of land at once” and that "because of the unique realties of gravel mining” the "use” of property by which such operator acquired vested rights encompassed all portions of the parcel intended to be excavated (id., at 285-286 [emphasis added]). Further, this Court’s holding in Syracuse Aggregate expressly adopted the reasoning of the Fourth Department in Matter of Fairmeadows Mobile Vil. v Shaw (16 AD2d 137, supra). In that case, the Court held that the rule for determining the extent of a nonconforming use based upon the nature *465 of the use applied to a zoning dispute involving residential property, specifically a house-trailer camp (id., at 141-142). The instant case also involves a different "unique” use that the majority entirely excludes from the beneficial application and reach of Syracuse. Importantly, the "use” at issue here, while not depleting, is substantially more limited in nature and consequence than that involved in Syracuse Aggregate; it does not, for example, involve any "appropriation” of the Foundation’s property, as the majority suggests (see, majority opn, at 459). Syracuse is simply not about a particular classification or type of use, but also implicates a wider principle and analysis of land use governance and restrictions.
Although this Court has not foursquarely determined the extent of a continuing nonconforming use of property in the circumstances presented in the instant matter, useful guidance may be gleaned from some analogous case law. In Rogers v Association for Help of Retarded Children (308 NY 126), the aptly significant issue presented was whether a school for special needs children was a continuation of a prior nonconforming use of the property as a convalescent home for cardiac children (id., at 131-132). The record in that case established that the prior owner of the property operated a home which cared for children suffering from cardiac ailments. Although the convalescent home’s main activity was the provision of medical care, the children attended classes on the first floor of the building in conjunction with receiving treatment (id.). The subsequent owner of the premises operated the building as a school for special needs children without providing any medical services. In holding that the use of the building as a school was merely a continuation of its prior nonconforming use as a convalescent home, this Court placed great weight on the fact that the Education Law required that children in the convalescent home be educated and the "strong public policy of the State which favors the education of all children” (id., at 132). Thus, it was held that "[a]t the time of the adoption of the zoning ordinance, the property was used as a convalescent home for cardiac children, an incident of that use being the schooling of the children. Defendant’s present use of the property is a restriction or limitation of the prior nonconforming uses of the property” (id., at 133 [emphasis in original]; see, Matter of Wiltwyck School for Boys v Hill, 11 NY2d 182; see also, United Citizens of Mount Vernon v Zoning Bd. of Appeals, 109 Misc 2d 1080).
For over 30 years, initially under the jurisdiction of the Town of Ramapo and now within the narrower confines of the Vil *466 lage of Chestnut Ridge, the Steiner Foundation has carried out its mission of providing elder care in a unique and diverse environment. Consistent with its nursing home and senior residence classification and function, the Foundation has developed and used its property within legal and authorized limits and in line with its exemplary purpose of providing an inter-generational "Fellowship Community” through mixed use structures which provide both housing and community service and recreation areas. This concept is central to the Foundation’s community service as it provides the environment for close interaction between co-workers and elderly residents, differentiating itself from the isolation more usually experienced by elderly individuals residing in other traditional institutional settings.
The record establishes that the Steiner Foundation’s inter-generational community concept has manifested itself continuously and consistently through its use and development of the property. The 1963 Special Permit granted by the Town of Ramapo permitted not only "residences for the aged” but also "adjunct services and facilities.” During a meeting of the Ramapo Zoning Board of Appeals on August 10, 1972, the Deputy Town Attorney during a discussion of whether the Foundation’s use of the property was within the grant of the special permit which was issued in 1963 and the site plan subsequently submitted in 1968 stated that, "[the permit] is not to erect a building. It is to permit a use in a building, to permit a use in the land. Here, a special permit was granted for a particular use. The use of this property for geriatric care.”
In 1986, the Village of Chestnut Ridge, prior to the creation of the appellant Board, approved the conversion of one of the Foundation’s buildings from a single-family house into a nonconforming multiple dwelling without requiring any use variances. Subsequently in 1990, the Foundation applied for bulk and area variances because of the Village Board’s assertion, for the first time, that there were potential zoning defects on the property. Even then, the Village Board did not require the Foundation to obtain any use variances for the property.
These events are recited as the history, the evidence and the context of the long-time understanding among successive municipal entities and the landowner as to the nature and extent of the Foundation’s nonconforming use of its premises under the 1963 Special Permit and the 1968 site plan as continued to this day. These factors are not noted as an adoption of any estoppel notion; I fully concur that such a theory is not appli *467 cable to this case (see, Matter of Parkview Assocs. v City of New York, 71 NY2d 274, 282 [quoting City of Yonkers v Rentways, Inc., 304 NY 499, 505]; Matter of E.F.S. Ventures Corp. v Foster, 71 NY2d 359, 369).
For over 30 years the Foundation has pursued a pattern of use and development pursuant to the rights granted to it in its Special Permit and overseen by various local zoning boards. The Foundation’s property was not only "pregnant with nonconformance” at the time the Village’s Zoning Law evolved out of the Town of Ramapo, but both the Town of Ramapo and the Village of Chestnut Ridge have acted as proud municipal partners of sorts in nurturing the life and continuance of these particular and unique nonconforming uses which the Village Board now curtails by prevailing in this lawsuit (contrast, United Citizens of Mount Vernon v Zoning Bd. of Appeals, 109 Misc 2d 1080, 1084, supra).
I am persuaded that this cramped application of the zoning ordinance, to frustrate a legitimate, slight variation of the long-standing use of this property, does not accord with the balance wheel principle of protection of an owners’ vested rights to continuation of nonconforming uses (cf., Lutheran Church v City of New York, 35 NY2d 121, 129). This is not a use "expansion” or at least not the kind of legally cognizable expansion that the majority concludes is at work here (compare, Matter of New York Pub. Interest Research Group v Town of Islip, 71 NY2d 292, 307 [Kaye, J., dissenting]).
As noted above, the only portion of the Foundation’s proposed alterations at issue in this case is conversion of storage space into a second staff apartment in one of the multiple-use buildings on the Foundation’s campus. The purpose behind this renovation is to create "more of a balance between the activity space and living space” within Building 10.
The Village Board has taken the position in support of its denial of a use variance that this minor renovation constitutes a new residential use and is therefore not included within the existing nonconforming use of the building. This argument ignores the fact that Building 10 and the other buildings on the Foundation’s property were approved, built and operated as multiple-use structures. The integration of the residential and support facilities is an inherent part of the creation of a community in which the elderly residents are empowered to feel that they are part of a community. The constricted application of the Village’s Zoning Law to these existing *468 nonconforming structures intrudes the municipality into the appropriate balance and proportion of functions within a building and restricts the ability of some elderly residents to cod-well with their co-worker staff-support "families,” in contradiction to the Foundation’s mission and purpose.
Notably, Building 10 already contains one apartment and the additional proposed living space would not itself require any external changes to the structure. It is only the proportion of use within that is affected. Thus, the renovation plan does not create a new use, but a continuing and interrelated one, albeit a differently proportioned one, within the scope of the existing Special Permit and within fairly applied land use principles and precedents — hardly the "virtual carte blanche” expansion that the majority hypothesizes (majority opn, at 460).
Relevantly for context, in granting this very Foundation an exemption from certain provisions of the Social Services Law, the Legislature itself stated:
"The Rudolf Steiner Fellowship Foundation, Inc., has * * * provided care to the elderly in a multigenerational setting called the fellowship community. The fellowship community operates an adult care facility in which the focus is on the care of the older person, while intermingling activities for both young and old alike. The interplay of the various ages is seen as essential to the well-being of the entire community. The fellowship community cultivates active relationships between people of all ages in the process of caring for the elderly.
"The unique philosophy of care and services of the Rudolf Steiner Fellowship Foundation, Inc., as provided at the fellowship community, is such that the legislature enacts this statute to allow the continuation of this program” (L 1986, ch 155, § 1 [emphasis added]).
The express, laudatory recognition by the Legislature of the Foundation’s structure and activities prior to the enactment of the Village’s Zoning Law is some evidence of the unique scope of the Foundation’s use of its property and the essential náture of its multiuse buildings to its presently authorized operation and development (see, Rogers v Association for Help of Retarded Children, 308 NY 126, 132, supra). I recognize and accept without question that this overview does not eclipse or preempt local land use prerogatives, but that would not be the legal or practical consequence of the affirmance I support for this case.
*469 Contrary to the Board’s arguments, recognition of the Foundation’s nonprofit status and laudable public purpose does not confer "favored status” upon it with respect to residential zoning ordinances (contrast, Cornell Univ. v Bagnardi, 68 NY2d 583, 593). The analysis and application of standard protocols that I propose are objectively and independently supportable, with no ensuing disturbance to nonconforming use precedential doctrine or policies. I urge legitimate factors in determining the extent of the Steiner Foundation’s vested use rights in its nonconforming structures as "the right to a nonconforming use must necessarily be decided 'on a case-by-case basis’ ” (Matter of Toys "R” Us v Silva, 89 NY2d 411, 422, supra [emphasis added] [citation omitted]).
In addition, the Village Board misplaces reliance and appears to overstate the reach of Matter of Toys "R” Us v Silva (89 NY2d 411, supra). The holding of that case has little applicability to or control over the instant matter. The sole issue there was "the appropriate legal standard to determine whether a nonconforming use has been discontinued under the Zoning Resolution” (id., at 414-415). No issue was raised in that case as to the scope or extension of the nonconforming use. In fact, it was assumed that if the prior nonconforming warehouse use had not been abandoned, the petitioner would have retained vested rights to operate a retail toy store, a very different nonconforming use, on the premises under the City Zoning Resolution (id., at 422-423). A further distinguishing feature is that Toys "R” Us concerned the vested right to operate a commercial retail toy superstore on the East Side of Manhattan, a situation which is in no way comparable in impact, scope or purpose to a minor modification within an already mixed-use building that is part of a residential, suburban, elder care community.
The Board makes a floodgate argument that a judicial recognition of the Foundation’s vested rights to complete the proposed second apartment alteration to Building 10 would render the Foundation immune from the application of the Zoning Law. That is a specious claim. The Foundation, contrary to the Village’s and majority’s fears, would not garner an unfettered right to develop its property. Its vested rights extend only as far as reasonably related and within its prior and continuing nonconforming use derived from the 1963 Special Permit. Further, the Village can adopt measures "reasonably regulating” the Foundation’s nonconforming use of the property and could, "in a reasonable fashion,” even ultimately *470 eliminate it (Matter of Syracuse Aggregate Corp. v Weise, 51 NY2d 278, 287, supra; see, Matter of Harbison v City of Buffalo, 4 NY2d 553, 561, supra).
For over 30 years the Foundation has sought through the development of its property to create a widely admired, mixed-use, intergenerational elder care community. Its project, pursued in compliance with all the applicable Town and Village ordinances, should not have to suffer this nettlesome uncertainty, as the Village Board gains the upper hand with its unduly narrow construction of the Steiner Foundation’s vested property nonconforming use entitlements. In my view, settled rules of land use planning and policy support an affirmance of the analysis and result reached by both lower courts. Perhaps, the remittal for further proceedings directed as part of this Court’s reversal will produce an accommodating solution.
Chief Judge Kaye and Judges Titone, Smith, Levine and Ciparick concur with Judge Wesley; Judge Bellacosa dissents and votes to affirm in a separate opinion.
Order reversed, etc.