[872 NYS2d 766]

In the Matter of LIGHTHOUSE POINTE PROPERTY ASSOCIATES LLC, Respondent, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION et al., Appellants.

Fourth Department, February 6, 2009

**APPEARANCES OF COUNSEL**

*Andrew M. Cuomo, Attorney General*, Albany (*Karen R. Kaufmann* of counsel), for appellants.

*Knauf Shaw LLP*, Rochester (*Alan J. Knauf* of counsel), for respondent.

*Daniel M. DeLaus, Jr., County Attorney*, Rochester (*Michael E. Davis* of counsel), for Monroe County, amicus curiae.

*Franklin D'Aurizio*, Rochester, for Irondequoit Chamber of Commerce, amicus curiae.

## OPINION OF THE COURT

FAHEY, J.

The issue before us on this appeal is whether Supreme Court erred in granting the petition in this CPLR article 78 proceeding and directing respondent New York State Department of Environmental Conservation (DEC) to accept petitioner into the Brownfield Cleanup Program (BCP), set forth in Environmental Conservation Law (ECL) article 27, title 14. We conclude that the court erred in determining that the DEC acted in an arbitrary and capricious manner in denying petitioner's applications for acceptance into the BCP. We therefore conclude that the judgment should be reversed and the petition dismissed.

### Background

This appeal arises from petitioner's efforts to develop contiguous 22-acre and 25.4-acre parcels. The first of the parcels (Riverfront parcel) is located on the east side of the Genesee River in the Town of Irondequoit and the City of Rochester, close to the confluence of the Genesee River and Lake Ontario, while the second of the two parcels (Inland parcel) is located near the east side of the Genesee River (collectively, the site). Petitioner proposes to develop the site as a mixed-use neighborhood, including residential complexes, a marina, restaurants and a hotel. Petitioner estimates that the cost of the project will range between $150 million and $250 million.

The site presently is between 8 and 25 feet above mean lake level and has groundwater at approximately seven feet below surface level. The site is located across the Genesee River from the historic Charlotte lighthouse, which was once on the shore of Lake Ontario. According to one of petitioner's members, however, the lighthouse is now a "good distance" from the mouth of the Genesee River because the marshland in that area "filled in." Petitioner acknowledges that most of the site is located on a 100-year flood zone and encompasses what was historically a marsh area.

Much of the site was deemed wasteland during the early to mid-twentieth century. Most of the Inland parcel is located

within the footprint of a city landfill that operated from at least 1956 to 1962 and that served as a depository for residential refuse, ash, slag, sewage sludge and construction debris. The site has fill material ranges of 4 to 26 feet in depth, and at least some of the ground at that location is unstable. A wastewater treatment plant was located on a portion of the Inland parcel for approximately 60 years. The plant ceased to operate in the early 1980s and was demolished in the late 1990s. Sewage sludge from that plant was disposed of on the part of the site that contained a landfill through roughly 1970. Today, the portions of the site that are not vacant are primarily used for boat storage and parking.

## The Brownfield Cleanup Program Act

The Brownfield Cleanup Program Act was enacted in 2003 to encourage voluntary remediation of brownfield sites for reuse and redevelopment (*see* ECL 27-1403). A brownfield site, with certain exceptions not relevant herein, is defined as "any real property, the redevelopment or reuse of which may be complicated by the presence or potential presence of a contaminant" (ECL 27-1405 [2]). The term contaminant is defined as "hazardous waste and/or petroleum" (ECL 27-1405 [7-a]).

Participation in the BCP is subject to DEC approval (*see* ECL 27-1407 [1]; 6 NYCRR 375-3.4 [c]). The ECL lists grounds that mandate exclusion from the program (*see* ECL 27-1407 [8]; *see also* 6 NYCRR 375-3.3), including the failure of "real property [to] meet the requirements of a brownfield site" (ECL 27-1407 [8] [a]).

The benefits of admission to the BCP are at least twofold: successful applicants are entitled to significant tax credits (*see* Tax Law §§ 21-23; 6 NYCRR 375-3.9 [e]) and, upon completion of remediation, they also are entitled to a release from liability to the State of New York "arising out of the presence of any contamination in, on or emanating from the brownfield site" (ECL 27-1421 [1]). The release from liability is critical to financing brownfield projects, inasmuch as lenders are understandably wary of becoming responsible for toxic land in the event of a debtor's default in payment.

Once accepted into the BCP, participants are required to enter into a site cleanup agreement with the DEC (*see* ECL 27-1409 [8]). As required by statute (*see* ECL 27-1415 [6] [a]), the DEC has developed soil cleanup objectives (SCOs) considering various uses of land and 85 specific contaminants (*see* 6 NYCRR

375-6.1, 375-6.8 [b]). The SCOs are "remedial action objectives" (ECL 27-1415 [6] [a]) and, according to the DEC, they are intended to act as benchmarks for sites within a remedial program, not as guidelines for admission. The applicable SCO category for the uses contemplated by the project in question is "[r]estricted-residential" (6 NYCRR 375-1.8 [g] [2] [ii]).

## Procedural History

In November 2006 petitioner filed two applications for admission into the BCP, one for each of the parcels at the site. Those applications were supported by a remedial investigation report (RI Report) prepared for petitioner by its environmental consultant. In the RI Report, the environmental consultant identified numerous instances of "exceedances of soil and groundwater cleanup standards for a number of contaminants" and recommended various remedial measures to treat those "exceedances." The estimated cost of the remedial measures ranged from $4 million to $8 million and, by contrast, the assessed value of the site is approximately $1.3 million. The DEC denied petitioner's applications on the ground that "there is no reasonable basis to believe that contamination or the potential presence of contamination . . . is complicating the redevelopment or reuse of the property," and thus the site does not meet the definition of a "brownfield site" as defined in ECL 27-1405 (2).

Petitioner commenced this proceeding in July 2007, seeking to annul the determination of the DEC denying its BCP applications. Petitioner alleged with respect to the Riverfront parcel that the RI Report "shows exceedances of the restricted use residential SCOs . . . for numerous hazardous wastes, including benzo (a) anthracene, benzo (a) pyrene, benzo (b) flouranthene, lead and mercury." Petitioner further alleged that exceedances of recommended SCOs set forth in a DEC Technical and Administrative Guidance Memorandum were observed in surface samples for those hazardous wastes, as well as metals including nickel and zinc. In addition, according to the RI Report, exceedances of ambient water quality standards were observed at all groundwater monitoring wells on the Riverfront parcel. Sampling of the water at that site revealed the presence of approximately 18 metals.

With respect to the Inland parcel, petitioner alleged that testing revealed exceedances of restricted use residential SCOs for numerous hazardous wastes, as well as exceedances of ambient water quality standards at all groundwater monitoring wells.

Arsenic and specified metals were found in those wells. Petitioner further alleged that soil vapor probes confirmed the presence of volatile organic compounds in excess of health risk standards, and high concentrations of explosive methane also were detected at the Inland parcel.

Respondents sought dismissal of the petition, relying largely on the affidavit of an environmental engineer employed by the DEC. In that affidavit, the DEC employee considered the prior use of the parcels and addressed each paragraph of the petition alleging contamination. He then found that "the exceedances [of SCOs] were relatively few and not in great magnitude" and that, viewed in its entirety, petitioner's data failed to "indicate the presence of contamination at the property in quantities or concentrations sufficient to require remediation." The DEC employee further concluded that "[t]he highest values in soil vapor were encountered in the vicinity . . . where there are no current structures," and that "[w]hether indoor air in a structure later constructed in that area would pose a potential health risk cannot be determined from these exceedances." The DEC employee further noted that, in any event, the soil vapor results yielded only screening values that are used to determine whether further actions are required, but they did not confirm the presence of a health risk. In sum, the DEC employee concluded that the exceedances revealed by both historical and current sampling data were few in number, were limited in magnitude, were widely dispersed throughout the property, and did not indicate the need for remedial action. In his view, the majority of the environmental costs associated with the project would arise from the disposal of municipal solid waste, rather than the disposal of hazardous waste, and the "extra engineering and design requirements generally make development of a former municipal landfill cost prohibitive."

In challenging the conclusions of the DEC employee, petitioner submitted, inter alia, the affidavit of a professional engineer stating that the DEC's determination was contrary to the data collected at the site. Petitioner also submitted the affidavit of an owner of the portion of the site stating that prior efforts to develop his property at the site were abandoned because of complications posed by the hazardous substances located there.

As previously noted, the court granted the petition and directed the DEC to accept petitioner into the BCP based in part on the court's conclusion that the DEC failed "to state the

reasoning [it] employed in reaching" its decision that the SCO exceedances were minimal and thus would not complicate the project. The court concluded that "[b]y failing to provide any rational basis for [its] determination that the development of [the parcels] would not, or could not, be complicated by the possible presence of even minimal levels of contaminants, the DEC has failed to demonstrate that [its] actions were anything but arbitrary and capricious." This appeal ensued.

## Discussion

"[I]n a proceeding seeking judicial review of administrative action, the court may not substitute its judgment for that of the agency responsible for making the determination" (*Flacke v Onondaga Landfill Sys.*, 69 NY2d 355, 363 [1987]; *see Matter of Bath Petroleum Stor. v New York State Dept. of Envtl. Conservation*, 298 AD2d 883 [2002], *lv denied* 99 NY2d 507 [2003]). "[W]here . . . the judgment of the agency involves factual evaluations in the area of the agency's expertise and is supported by the record, such judgment must be accorded great weight and judicial deference" (*Flacke*, 69 NY2d at 363; *see Bath Petroleum Stor.*, 298 AD2d at 883). "[O]nce it has been determined that an agency's conclusion has a 'sound basis in reason' . . ., the judicial function is at an end" (*Paramount Communications v Gibraltar Cas. Co.*, 90 NY2d 507, 514 [1997], *rearg denied* 90 NY2d 1008 [1997]; *see Matter of Smith v New York State Div. of Hous. & Community Renewal*, 27 AD3d 1063, 1064 [2006]).

The recent decision of the Court of Appeals in *Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast* (9 NY3d 219, 232 [2007]) reiterates the above-referenced rules:

> "It is not the province of the courts to second-guess thoughtful agency decisionmaking and, accordingly, an agency decision should be annulled only if it is arbitrary, capricious or unsupported by the evidence. The . . . agency, after all, has the responsibility to comb through reports, analyses and other documents before making a determination; it is not for a reviewing court to duplicate these efforts. As we have repeatedly stated, '[w]hile judicial review must be meaningful, the courts may not substitute their judgment for that of the agency for it is not their role to "weigh the desirability of any action or [to] choose among alternatives." ' "

Based on the well-established principles of the role of the courts in reviewing agency determinations, the issue before us

is whether the DEC acted irrationally or in an arbitrary and capricious manner in determining that the redevelopment of the site would not be complicated by the presence or potential presence of contaminants there (*see* ECL 27-1405 [2]). It is beyond dispute that reasonable minds may differ in the interpretation and analysis of the data collected at the site, and it therefore cannot be said that the rejection by the DEC of petitioner's BCP applications was unsupported by the evidence, nor can it be said that the DEC acted in an arbitrary and capricious manner in rejecting those applications. The determination of the DEC was premised upon the results of a thoughtful analysis performed by an environmental engineer who considered and based his opinion on the testing conducted on behalf of the DEC, as well as the data submitted by petitioner. Inasmuch as it is not the province of the courts to second-guess a reasoned agency determination or to invade the process by which such a conclusion is reached (*see e.g. Riverkeeper*, 9 NY3d at 232; *Paramount Communications*, 90 NY2d at 514; *Flacke*, 69 NY2d at 363), the petition should have been dismissed. The DEC's well-reasoned analysis of the BCP applications of petitioner, coupled with the mandate that we must not substitute our judgment for that of the DEC, compels the conclusion that the court erred in granting the petition and directing the DEC to accept petitioner into the BCP.

## Conclusion

Accordingly, we conclude that the judgment should be reversed and the petition dismissed.

SMITH, J.P. (dissenting). Because I conclude that respondent New York State Department of Environmental Conservation (DEC) misinterpreted the statutes applicable to the determination underlying the judgment in this proceeding, resulting in the arbitrary and capricious exclusion of petitioner's parcels from the Brownfield Cleanup Program ([BCP] ECL 27-1401 *et seq.*), I respectfully dissent and would affirm.

The parties correctly agree that the narrow issue presented on this appeal is whether the DEC acted arbitrarily and capriciously in concluding that petitioner's proposed redevelopment sites do not fall within the definition of a Brownfield site. " 'Brownfield site' or 'site' shall mean any real property, the redevelopment or reuse of which may be complicated by the presence or potential presence of a contaminant" (ECL 27-1405

[2]). In its brief on appeal, the DEC concedes that "the sampling data accompanying the applications satisfy the statutory standard of 'the presence or potential presence of a contaminant,' " but the record establishes that the DEC denied petitioner's applications to participate in the BCP on the ground that redevelopment or reuse of the subject parcels will not be complicated thereby. In his letter denying petitioner's applications to include the subject parcels in the BCP, respondent Director of the DEC's Division of Environmental Remediation concluded that "it is likely that any [contaminants] are attributable to solid waste disposal," and thus that the parcels are not eligible for the BCP. In addition, the DEC engineer who recommended the denial of petitioner's applications concluded that the redevelopment of the property was complicated by its former use as a solid waste landfill, and that contaminants that arose from such use were not to be considered in an application for inclusion in the BCP. I note that it is the position of the DEC that we must defer to its determination that those contaminants do not complicate the development of the property, because that determination falls within its area of expertise. I disagree, and conclude that this case in fact presents a paradigm of sites that fall within the ambit of the BCP as defined by the statutes, and that the interpretation by the DEC of the BCP's enabling statutes to exclude the subject parcels is unreasonable.

Initially, I of course agree with the majority that "[i]t is well settled that an agency's interpretation of the statutes it administers must be upheld absent demonstrated irrationality or unreasonableness" (*Matter of Buffalo Columbus Hosp. v Axelrod*, 165 AD2d 605, 607 [1991]; *see Barrett v Lubin*, 188 AD2d 40, 44 [1993]). However, it is equally well settled that, where "the question is one of pure legal interpretation of statutory terms, deference to the [administrative agency] is not required" (*Matter of Toys "R" Us v Silva*, 89 NY2d 411, 419 [1996]; *see Matter of Teachers Ins. & Annuity Assn. of Am. v City of New York*, 82 NY2d 35, 41-42 [1993]; *Matter of Moran Towing & Transp. Co. v New York State Tax Commn.*, 72 NY2d 166, 173 [1988]). Inasmuch as the DEC's interpretation of the statutory scheme under which it determines which sites are eligible for participation in the BCP "is one of pure legal interpretation of statutory terms" and thus is not entitled to deference (*Toys "R" Us*, 89 NY2d at 419), I conclude that the DEC's interpretation is both unreasonable and arbitrary, and that petitioner's applications should have been granted.

The interpretation of the term "Brownfield site" is a matter of first impression at the appellate level. The language of the statute defining that term and the legislative intent in enacting the BCP, however, demonstrate that the DEC's interpretation of that term is unreasonably narrow. The Legislature's intent is clearly and unequivocally set forth in ECL 27-1403, entitled "Declaration of policy and findings of fact":

> "The legislature hereby finds that there are thousands of abandoned and likely contaminated properties that threaten the health and vitality of the communities they burden, and that these sites, known as brownfields, are also contributing to sprawl development and loss of open space. It is therefore declared that, to advance the policy of the state of New York to conserve, improve, and protect its natural resources and environment and control water, land, and air pollution in order to enhance the health, safety, and welfare of the people of the state and their overall economic and social well being, it is appropriate to adopt this act to encourage persons to voluntarily remediate brownfield sites for reuse and redevelopment by establishing within the department a statutory program to encourage cleanup and redevelopment of brownfield sites."

It is well settled that "the starting point in any case of [statutory] interpretation must always be the language itself, giving effect to the plain meaning thereof" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]; *see also* McKinney's Cons Laws of NY, Book 1, Statutes §§ 76, 94; *Matter of Malta Town Ctr. I, Ltd. v Town of Malta Bd. of Assessment Review*, 3 NY3d 563, 568 [2004]; *Patrolmen's Benevolent Assn. of City of N.Y. v City of New York*, 41 NY2d 205, 208 [1976]). Here, the plain language of the statute defining the term "Brownfield site" encompasses "any real property, the redevelopment or reuse of which may be complicated by the presence or potential presence of a contaminant" (ECL 27-1405 [2]). The Court of Appeals has stated that " 'the word "any" is as inclusive as any other word in the English language' " (*New Amsterdam Cas. Co. v Stecker*, 3 NY2d 1, 6 [1957]). The use of additional broad language in ECL 27-1405 (2), including "may be complicated," when coupled with the highly inclusive "presence or potential presence of a contaminant" (*id.*), requires that we give an expansive reading to the legislation. Further, the use

of "a contaminant" demonstrates the legislative intent that the presence of a single contaminant may be sufficient to complicate the redevelopment or reuse of real property. The Legislature could hardly have chosen broader language in either the statute defining the term "Brownfield site" or the statute entitled "Declaration of policy and findings of fact" to signify its intent to encompass a vast range of parcels that may be polluted.

Contrary to the majority's conclusion, this is not a case in which this Court must defer to the DEC's interpretation of the statute because it falls within the agency's area of expertise. I agree that the DEC has particular expertise with respect to cases that involve a mixture of law and science, but this is not such a case. Instead, the DEC has improperly interpreted the enabling statutes for the BCP, resulting in the arbitrary exclusion of parcels containing contaminants that arise from solid waste despite the absence of any statutory basis for such an exclusion. It is well settled that "[a]dministrative agencies can only promulgate rules to further the implementation of the law as it exists; they have no authority to create a rule out of harmony with the statute" (*Kahal Bnei Emunim & Talmud Torah Bnei Simon Israel v Town of Fallsburg,* 78 NY2d 194, 204 [1991], *rearg denied* 78 NY2d 1008 [1991] [internal quotation marks omitted], quoting *Matter of McNulty v New York State Tax Commn.,* 70 NY2d 788, 791 [1987]). By administratively redacting solid waste disposal sites from consideration for inclusion in the BCP, the DEC has improperly usurped the legislative function. Consequently, I conclude that Supreme Court properly granted the petition and directed the DEC to accept petitioner into the BCP.

On appeal, the DEC contends that its determination comports with the "Eligibility Guidance" (Guidance) that it has prepared for evaluating applications for the BCP. I note that the affidavit of the DEC engineer who recommended the denial of petitioner's applications does not discuss, or even mention, the Guidance. Furthermore, the Guidance lists four factors to be considered in determining whether a proposed site comes within the "Brownfield Definition" and thus is eligible for admission to the BCP, and there is no indication that any were considered by the DEC in making its determination. Additionally, there is no indication that the Guidance bears any of the imprimatur of law because the DEC has not promulgated it as a regulation, and it is not included in the BCP statutes. Finally, the Guidance is so vague that it can be used to justify the approval or denial of any ap-

plication. For instance, the Guidance indicates that the DEC should consider, inter alia, "whether the proposed site is idled, abandoned or underutilized; . . . [or] whether the proposed site is unattractive for redevelopment or reuse due to the presence or reasonable perception of contamination" (Guidance 2.2 [3] [A], [B]). I conclude that the subject parcels, a portion of which was formerly a municipal dump and sewage treatment plant that currently is vacant land or is used for boat storage and parking, unquestionably fits within that language, but the DEC uses the Guidance to reach a contrary result. The remaining items in the Guidance, concerning the use and values of the properties in the immediate vicinity and the estimated costs of remediation (*id.* at [3] [C], [D]), were never discussed by the DEC personnel in making the determination at issue. Consequently, inasmuch as the Guidance could be used either to justify the approval or the denial of petitioner's applications, coupled with the DEC's failure to apply it in determining whether to include petitioner's parcels in the BCP, I conclude that the Guidance is irrelevant to the issue whether the denial of petitioner's application was arbitrary and capricious.

I further conclude that the DEC's failure to promulgate any viable regulation for evaluating applications for admission into the BCP is, of itself, arbitrary and capricious. The DEC has implemented no regulatory standards to enable a court to conduct any meaningful review of its determinations. The only existing standard for judicial review of the contamination of polluted properties is the DEC's "soil cleanup objectives," which set forth the goals for the maximum amounts of contaminants remaining after remediation (*see* 6 NYCRR 375-6.8). The DEC contends that those standards may not be used to ascertain whether a property is eligible for participation in the program, however, because they are goals for the completion of remediation, not the standards for determining whether a property is in fact contaminated. That contention flies in the face of the DEC's reliance upon those same standards in calculating the presence of contaminants on a property. More importantly, if we accept the DEC's contention, then there is no objective guideline for evaluating the presence and levels of contaminants on a property. Stated differently, if the "soil cleanup objectives" are not the standard for determining whether a property is contaminated, then there is no standard at all.

Turning to the specifics of this case, I conclude that the DEC's determination to deny these applications was unreasonable in

light of the evidence presented, and was arbitrary and capricious in light of the lack of standards. The DEC admits, through the reviewing engineer's affidavit, that the samples taken from the subject parcels indicate that five volatile organic compounds, seven toxic metals, and six polyaromatic hydrocarbons were found on the sites in amounts exceeding the soil cleanup objectives. Indeed, the reviewing engineer acknowledged that the data submitted by petitioner establishes that those "exceedances" exist. In recommending that the applications be denied, however, the reviewing engineer concluded that any contaminants present on the site in amounts exceeding the soil cleanup objectives were "few in number, limited in magnitude, and widely dispersed throughout the property." As discussed above, the DEC has failed to provide any standard against which it measures the number, magnitude or dispersal of the contaminants that were admittedly present, thus demonstrating the arbitrary nature of the reviewing engineer's conclusion. Furthermore, he discounted all of the exceedances in groundwater samples. He minimized the presence of lead in approximately one sixth of the soil samples that were at levels up to seven times greater than the soil cleanup objectives, and he simply failed to discuss the presence of the other six metals found in the soil. He admitted that five volatile organic compounds existed at levels exceeding the soil cleanup objectives and concluded that he could not determine the potential health risk from those exceedances, yet he recommended that the DEC conclude that those exceedances did not complicate the redevelopment of the parcels. Finally, the reviewing engineer refused even to consider the amounts of methane gas present on the property because "[m]ethane gas generated from putrescible solid waste is not considered hazardous waste for purposes of eligibility for the BCP," but he provided no statutory support for that conclusion.

I agree with petitioner that each of its parcels is a "Poster Child" of a prototypical Brownfield site, the remediation of which the Legislature intended to encourage by creating the BCP (*see Destiny USA Dev., LLC v New York State Dept. of Envtl. Conservation*, 19 Misc 3d 1144[A], 2008 NY Slip Op 51161[U], *4). In sum, I would affirm because I agree with the court that there is "no rational basis to conclude that the levels of contamination at this site were 'minimal' " (*see Matter of HLP Props. LLC v New York State Dept. of Envtl. Conservation*, 21 Misc 3d 658 [2008]), particularly in light of the DEC's failure

to provide any standard against which we may evaluate that conclusion.

Accordingly, I would affirm the judgment.

CENTRA and GREEN, JJ., concur with FAHEY, J.; LUNN, J., did not participate. SMITH, J.P., dissents and votes to affirm in a separate opinion.

It is hereby ordered that the judgment so appealed from is reversed, on the law, without costs, and the petition is dismissed.