**RICO CORPORATION**

v.

**TOWN OF EXETER et al.**

No. 2000–86–Appeal.

Supreme Court of Rhode Island.

Dec. 21, 2001.

William Mark Russo, Claire Kane Hall, Providence, for plaintiff.

James P. Marusak, Anthony F. DeMarco, Providence, for defendant.

BEFORE: LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, J.

In this declaratory judgment action, RICO Corporation and the Town of Exeter (plaintiff and defendant, respectively), each appeal from the partial granting and partial denial of their respective cross-motions for summary judgment by a justice of the Washington County Superior Court on October 21, 1996. They also appeal from the final judgment entered on October 4, 1999, by a second trial justice of that court after

a trial on the merits of RICO's complaint for declaratory and injunctive relief and the town's counterclaim.

For the reasons hereinafter set out, we vacate the entry of the initial partial summary judgment that was based upon a presumed finding that a valid nonconforming use existed on property located in the Town of Exeter, Rhode Island that previously was owned by Marcel and Barbara LaCroix, and is now owned by RICO and which serves as the epicenter of this litigation. Because the final judgment entered by the second Superior Court justice on October 4, 1999, was in large measure founded upon the motion hearing justice's initial finding concerning the existence of the nonconforming use, we vacate that final judgment.

## I

### Facts/Procedural History

In 1972, Marcel and Barbara LaCroix (LaCroix) owned approximately 158 acres of woodland in the Town of Exeter. The property's eastern boundary abuts the state veterans cemetery and its southern boundary abuts Route 2, commonly known as South County Trail. At that time, Marcel LaCroix (Marcel) is alleged to have been using a small portion of his land as a sand and gravel bank. That use, if it in fact existed at that time, was a lawful use of the land because the Town of Exeter, as yet, had not enacted any earth removal or town zoning ordinances regulating land use in the town.

In 1973, the General Assembly enacted P.L.1973, ch. 190. That act served as enabling legislation for the Town of Exeter to "Enact Ordinances Regulating, Controlling and Licensing Earth Removal." Pursuant to the 1973 enabling legislation, the Exeter Town Council proceeded to enact an ordinance regulating earth removal operations in the town and made unlawful any earth removal operations thereafter in the town unless first being licensed by the town council. The licensing ordinance took effect on July 2, 1973.

Sections 6 and 7 in the town's licensing ordinance made provision for license application information and data required to obtain an earth removal license from the town council. Section 6 required an applicant to provide the town council with a plan prepared by a registered engineer setting out the existing contours of the tract of land upon which the earth removal operation was to be conducted. It also required the registered engineer to classify preliminary samples of the materials to be removed, describe what the final contours of the tract of land would be upon completion of the earth removal operations, and the type of ground cover that would be planted or applied to the excavated areas. The registered engineer also was required to give an opinion that, upon completion of the earth removal operations conducted upon the particular tract (not to exceed three years), all slopes in the tract would remain at "the natural angle of repose." In addition, the registered engineer was required to state the time when the earth removal operation would close and when the engineer's plan would be complied with. Section 7 in the ordinance provided that upon the filing of the required application for a license, a $25 license fee, and a performance bond not to exceed $100 for each acre of land upon which the earth removal operation was to be conducted, the town council, if it approved the application and the required engineer's plan and opinions, would issue the earth removal license.

Sections 15 and 16 of the 1973 licensing ordinance take on a particular significance in this case because of Marcel's allegation that he had been conducting a small sand and gravel operation on a ten-acre portion

of his land before the effective date of the earth removal ordinance.

Section 15 in the ordinance exempted any continuing earth removal operation that existed on July 2, 1973, from the provisions of the ordinance. However, that exemption continued only for a period of sixty-days and within that period an application to license the preexisting earth removal operation was required to be filed with the town clerk. The application was to be accompanied by all of the plans and information required by sections 6 and 7 of the ordinance, excluding, however, any plan setting forth the existing contours for portions of any tract of land upon which any earth removal had been completed before July 2, 1973.[1] Upon submission of the required plans and information, section 15 provided that the Town Council shall "forthwith issue" a license permitting continuation of the preexisting earth removal operation.

Section 16 of the earth removal licensing ordinance additionally made provision for property that was intended for earth removal operations by an owner or lessee of the property, but upon which no actual earth removal operations had been commenced prior to the effective date of the earth removal ordinance. That particular portion of section 16 permitted the owner or lessee of any such property to file in the office of the town clerk, on or before December 3, 1973, a statement setting forth the owner or lessee's "intention to engage in earth removal on said tract of land and describing said tract of land[.]" Once filed, "then such tract of land shall be deemed to qualify" for an earth removal license. However, "as to any tract of land for which such intention is not so filed then the provisions of [section 16] shall have no force and effect."

Nothing in the case records before us in this appeal indicates or discloses that Marcel, who alleges that he had been conducting a small preexisting sand and gravel operation on a ten-acre portion of his property prior to July 2, 1973, ever had complied with any of the license application filing requirements contained in section 15 of the licensing ordinance within the sixty-day license exemption period.[2] The case records also fail to indicate or disclose that Marcel or the LaCroixes ever filed any statement on or before December 31, 1973, pursuant to section 16 of the licensing ordinance, setting forth his, or their, intention to engage in any earth removal operations upon the property.

To further complicate the chronology of events concerning Marcel's apparent failure to comply with any of the licensing requirements required by the town's 1973 earth removal licensing ordinance, the Exeter Town Council, in early 1977, enacted its first comprehensive town zoning ordinance that became effective on May 2, 1977. By virtue of that zoning ordinance, the LaCroix property was placed in an RU-3 rural/residential zone district. In that rural/residential zoning district, gravel or sand banks, and quarries are not permitted uses. Those uses are permitted only in a zoned industrial district, and then, only by special exception from the town's zoning board of review.

■ It appears from the record that on September 26, 1985, about twelve years after the town's earth removal licensing

1. Sections 6 and 7 of the town's ordinance tracks sections 5 and 6 of the 1973 Enabling Act.

2. Marcel, at a hearing before the zoning board of review on July 12, 1993, actually

testified that he began his sand and gravel operation in 1974, the year after the town's earth removal licensing ordinance was enacted.

ordinance was enacted, and over eight years after the town's zoning ordinance was enacted, Marcel for the first time decided to go to the town clerk's office and request an earth removal license "for Westerly side of South County Trail in the Town of Exeter, R.I. ten (10) acres of land with 20% grade." It appears, however, that he did so without complying in any significant manner with the necessary prerequisite license application requirements contained in the earth removal licensing ordinance, or in compliance with the town's zoning ordinance. The town clerk, on September 26, 1985, for no discernibly valid reason, granted and issued him an earth removal license for a term not to exceed thirty-six months.[3] In doing so, the town clerk appears to have completely ignored not only the license filing requirements of the town's earth removal ordinance, but also the town's zoning ordinance, which eight years earlier had designated the LaCroix property to be in an RU–3 rural/residential zone within which sand, gravel and quarrying operations are prohibited uses. In addition, we discern no evidence in the record before us to demonstrate that the town council previously had approved the earth removal license application filed by Marcel within the time periods proscribed by sections 15 and 16 of the earth removal ordinance.

In 1988, three years after Marcel obtained his questionable earth removal license, RICO expressed an interest in purchasing the LaCroix property. At that time, as noted earlier, the property was zoned only for RU–3 rural/residential use. RICO agreed to purchase the LaCroix property provided that the LaCroixes could confirm to RICO the existence of a nonconforming earth removal use for their property that would permit a sand and gravel earth removal operation to be continued thereon, and provided also that Marcel's existing earth removal license could be transferred to RICO. On November 16, 1988, Marcel somehow was able to obtain a document entitled "Zoning Certificate" from the town's zoning inspector. That document purported to confirm the existence of Marcel's current "Gravel Bank License" and noted that the property conformed "to the provisions of the Town of Exeter Zoning Ordinance."[4] In February 1989, RICO purchased the property.[5]

In December 1992, the town, through its solicitors, gave RICO notice that it had received complaints from neighbors concerning blasting operations being conducted on RICO's property. Specifically, the neighbors complained that the blasting was so violent that it was causing structural damage to their homes, damaging their personal effects, producing substantial

---

**3.** "[W]hen [a] proposed use does not conform to the zoning requirements, the [town clerk] has no authority to issue a [license]." *Town of Johnston v. Pezza,* 723 A.2d 278, 284 (R.I. 1999).

**4.** It should be noted that the zoning inspector never stated in the "Zoning Certificate" that a nonconforming use to conduct an earth removal or sand and gravel bank existed on the LaCroix property. Indeed, the words "nonconforming use" do not appear anywhere on the face of the certification.

**5.** It is interesting to note that the certification issued by the then zoning inspector relating

that the "Property Has Current Gravel Bank License" apparently was in error. The records before us reveal that Marcel was issued his first and only earth removal license on September 26, 1985. That license, even if valid, pursuant to section 6(4) in the licensing ordinance, was valid for only a thirty-six month period, and expired unless renewed. There is no evidence showing its renewal by Marcel. Consequently, on September 25, 1988, Marcel's license apparently had expired. Thus, when on November 16, 1988, the zoning officer certified it as being a "current" gravel bank license, he appears to have been clearly mistaken.

amounts of dust and creating health problems. In addition, the town solicitors expressed concern that RICO might be blasting ledge and that such activities could adversely affect the town's groundwater supply. The town informed RICO through its solicitors that it intended "to scrutinize and oversee any further blasting to be conducted upon the site."

On May 6, 1993, the town zoning inspector issued a cease and desist order against RICO, declaring that RICO, by quarrying, stockpiling and storing used asphalt and concrete on its property, was expanding its nonconforming use, in violation of the town zoning ordinance. After a show-cause hearing on the zoning inspector's cease and desist order, the zoning board of review (the board) issued a cease and desist order on August 31, 1993. The board found that:

1. RICO holds a gravel bank license and that the gravel bank is a legal nonconforming use.
2. The "stock-piling and recycling of asphalt * * * is an expansion of the existing use."
3. The "current license allows the appellant to blast rock but not ledge under [its] 'grandfathered' use."
4. The term "quarrying * * * means the blasting or cutting away of rock from ledge * * * [and] quarrying was not a legal pre-existing non-conforming use which was grandfathered * * *. The legal pre-existing non-conforming use which was grandfather[ed] is limited to the sand and gravel operations as described by Mr. LaCroix."
5. RICO "has been working with the neighbors to try and make [its] operation somewhat conducive to the area."

The board then proceeded to uphold the cease and desist order "for stockpiling, processing and recycling of asphalt and quarrying," and determined that RICO "may proceed with the operation in which

[it] has a license for." No appeal from this decision was taken.

Undaunted by the board's cease and desist order, RICO continued blasting ledge on its property. In April 1994, RICO applied to the town's zoning board of review for a "special exception" to the zoning ordinance to permit it to import and process asphalt and concrete on its property. The application stated that the "[p]roposed use is accessory to a valid nonconforming use * * *." On May 9, 1994, the board held a hearing on RICO's application for a special exception. After that hearing, RICO's request for a special exception was granted. On June 15, 1994, the board issued its written decision in which it permitted RICO, subject to plans that had been submitted by RICO to the board, to import and process asphalt, concrete and other road materials on its property. As with the 1993 order, no appeal was taken.

In November 1994, the town council amended its earth removal ordinance (the 1994 ordinance). That ordinance now defined earth removal as "the extraction or removal (without the blasting of ledge) of any sand, gravel, loam, topsoil, small stones, clay or shale from any tract of land, excluding however, earth removal necessary in the process of grading land." Besides the enumerated licensing requirements noted earlier, the 1994 ordinance also provided that the town council could request "any other information * * * which may be pertinent to the existing or proposed gravel bank."

In March 1995, RICO applied to renew its gravel bank license. In response, the town expressed concern that RICO's application was incomplete. The town council then asked RICO "to show cause why it should not issue a cease and desist order or otherwise review, limit or condition your current operations."

On June 29, 1995, the very same day that the show-cause hearing was scheduled to take place, RICO filed the instant petition for a declaratory judgment and for injunctive relief in the Washington County Superior Court. Later that evening, the town council show-cause hearing took place as scheduled. RICO's representative attended the meeting and took part in the hearing, but left before the meeting concluded. After the hearing and after reviewing the hearing testimony and reviewing the exhibits that had been introduced by the parties at the show-cause hearing, the town council, on July 12, 1995, issued a second cease and desist order. In that order, the town council found:

"A. Land is not being restored as required

"B. Blasting has occurred which is inconsistent with gravel removal operations

"C. Zoning Board approval of recycling activities should have been via a use variance instead of a special exception

"D. No evidence of State wetlands or other permits was produced

"E. Gravel removal operations have expanded beyond authorized limits

"F. Environmental and groundwater impacts."

The town council then concluded that RICO was "operating outside the scope of, and in contravention of, the intent of our Earth Removal Ordinance and licensing procedure." It ordered RICO "to cease and desist any site expansion activities on the site until such time as [RICO is] in total compliance with all regulatory requirements." No appeal was taken.

Meanwhile, the town had filed a counterclaim in RICO's pending Superior Court action. The counterclaim asserted that RICO's use of its property violated various town ordinances, and it challenged the existence and the validity of RICO's alleged nonconforming use of the property. Thereafter, RICO moved for partial summary judgment on its petition for declaratory relief, and the town cross-motioned for summary judgment on its special defenses and counterclaim. After hearing and reviewing the summary judgment hearing materials, a Superior Court hearing justice ruled on October 21, 1996, that:

(1) RICO has a valid, preexisting nonconforming gravel bank use and that lateral expansion of that nonconforming use is permissible;

(2) RICO must reclaim any areas disturbed since the enactment of the 1994 ordinance in accordance with its provisions;

(3) the zoning board's special exception permitting the stockpiling and processing of asphalt and concrete was not appealed; therefore, it is a valid and binding decision;

(4) the 1993 order was not appealed and became final. In accordance with that order, RICO has a limited grandfathered right to blast rock; however, it may not blast ledge.

In 1998, a trial on the remaining issues raised by the parties was conducted before a second and different Superior Court justice sitting without a jury.[6] After hearing testimony and reviewing the evidence, that trial justice considered the preexisting nonconforming use findings made earlier by the summary judgment motion hearing justice as being conclusive upon her. She determined that the first hearing justice's summary judgment findings had become the law of the case. She rejected, however, RICO's contention that the town was

6. The trial justice rejected RICO's assertions that the town's actions were unconstitutional and that both the board and the town employed personal and/or political animus in making its decisions. These issues have not been appealed, and therefore, are not before us for review.

equitably estopped from prohibiting its blasting of ledge. After entry of the final judgment, the parties filed cross-appeals.

Additional information will be provided as needed.

## II

### The Summary Judgment

When called upon to review the granting or denial of a motion for summary judgment, this Court does so on a *de novo* basis. *See Macera Brothers of Cranston, Inc. v. Gelfuso & Lachut, Inc.,* 740 A.2d 1262, 1264 (R.I.1999). In so doing, we review and evaluate, in a light most favorable to the nonmoving party, the case pleadings, any admissions and answers to interrogatories and other case file materials that we deem relevant to our review to determine whether there exists any genuine issue of material fact, or whether the moving party was entitled to judgment as a matter of law. *See ElGabri v. Lekas,* 681 A.2d 271, 275 (R.I.1996). Mindful that the entry of summary judgment is an extreme remedy that should be applied cautiously, *see Reniere v. Gerlach,* 752 A.2d 480, 482 (R.I.2000), we view the duty of the motion hearing justice to be that of issue finding and not issue resolution. *See General Motors Acceptance Corp. v. Johnson,* 746 A.2d 122, 124 (R.I.2000).

In this case, we note from the case pleadings that, in its answer to RICO's complaint and by special defenses, the town contested RICO's contention that its property benefited from any valid noncon-forming use that permitted RICO to conduct its earth removal operation upon the property it had purchased from the La-Croixes in 1989. That issue once raised presented not only a material issue of fact to be resolved by a fact-finder, but from the record before us, it surfaces as the core issue in this case concerning the respective contentions of the parties.

However, following the hearing on the parties' cross-motions for summary judgment, the motion hearing justice, in her decision on October 21, 1996, treated and considered the nonconforming use issue as a non-issue. She did so in reliance upon the August 31, 1993, unappealed decision of the Exeter Zoning Board of Review. In that matter, the board had before it RICO's appeal from a cease and desist order that had been issued by the town's zoning inspector prohibiting RICO from operating a quarry on its property. In the course of its decision upholding the zoning inspector's cease and desist order, the board went on to make a finding "[t]hat the property [RICO's] is zoned RU–3 and the [gravel bank] use is a legal nonconforming use existing prior to the current zoning ordinance." In her decision, the motion hearing justice concluded that because the zoning board's August 31, 1993 decision had not been appealed, the zoning board's determination that a legal nonconforming gravel bank use existed on the property was final and binding on both RICO and the town, citing to *Department of Corrections v. Tucker,* 657 A.2d 546, 549–50 (R.I.1995) for support.[7]

---

7. It is not clear that the Court's holding in *Department of Corrections v. Tucker,* 657 A.2d 546, 549–50 (R.I.1995) was intended to be applicable to zoning board of appeal decisions. In numerous other cases, none of which were cited in the *Tucker* opinion, this Court had repeatedly rejected application of the doctrine of *res judicata* to decisions of zoning boards of review; instead, it has consistently applied in those decisions the doctrine of administrative finality. *See, e.g., Au-dette v. Coletti,* 539 A.2d 520, 521 (R.I.1988); *May–Day Realty Corp. v. Board of Appeals of Pawtucket,* 107 R.I. 235, 237, 267 A.2d 400, 401–02 (1970); *Gilman v. Zoning Board of Review of West Warwick,* 103 R.I. 612, 613, 240 A.2d 159, 160 (1968) (per curiam); *Burke v. Zoning Board of Review of North Providence,* 103 R.I. 404, 408–09, 238 A.2d 50, 53 (1968); *Marks v. Zoning Board of Review of Providence,* 98 R.I. 405, 408, 203 A.2d 761,

▪ We are satisfied from the record before us that the motion hearing justice's reliance upon what she perceived to be the *res judicata* effect of the zoning board's decision on August 31, 1993, as barring her consideration of the town's challenge to RICO's nonconforming use claim, is insupportable. For *res judicata* principles to be applied to any judgment or decision, it is black letter cardinal law that the court or tribunal entering the judgment or decision must first have subject matter jurisdiction over the case before it. *See* 1 Restatement (Second) *Judgments* 2d ch. 2, § 11 (1982). In this case, the Exeter Zoning Board of Review had no statutory authority to make such a finding and lacked subject matter jurisdiction to do so. *See Hassell v. Zoning Board of Review of East Providence,* 108 R.I. 349, 352, 275 A.2d 646, 648 (1971); *Olean v. Zoning Board of Review of Lincoln,* 101 R.I. 50, 220 A.2d 177 (1966). In *Olean,* we stated:

> "Zoning boards are statutory bodies. Their powers are legislatively delineated. They are empowered to hear appeals from the determinations of administrative officers made in the enforcement of the zoning laws and in addition they may authorize deviations from the comprehensive plan by granting exceptions to or variations in the application of the terms of local zoning ordinances. * * * Notwithstanding that the enabling legislation does not permit nor the ordinance authorize any additional jurisdiction, the respondent board by purporting to confirm the legality of a pre-existing use in substance assumed to itself the power to issue declaratory judgments. This it had no right to do." 101 R.I. at 52, 220 A.2d at 178.

764 (1964) (setting out this Court's reasoning for rejecting application of *res judicata* to

▪ A nonconforming use is a particular use of property that does not conform to the zoning restrictions applicable to that property but which use is protected because it existed lawfully before the effective date of the enactment of the zoning restrictions and has continued unabated since then. *See Town of Scituate v. O'Rourke,* 103 R.I. 499, 503, 239 A.2d 176, 179 (1968). *See also* 1 *Anderson's American Law of Zoning,* § 6.01 (4th ed. Young 1996); 8A Eugene McQuillin, *Municipal Corporations,* § 25.186 (3rd ed.1996); 4 Arlen H. Rathkopf, *The Law of Zoning and Planning,* § 51.01 (1999); E.C. Yokely, *Zoning Law & Practice,* § 22–2 (4th ed.1979). Thus, "[f]or a nonconforming use to be sanctioned, it must be lawfully established prior to the implementation of the zoning restriction or regulation." *O'Rourke,* 103 R.I. at 504, 239 A.2d at 180; *see also* G.L.1956 § 45–24–31(49).

▪ The burden of proving a nonconforming use is upon the person or corporation asserting the nonconforming use, and that party must prove that the use lawfully was established before the zoning restrictions were placed upon the land. *See Town of Glocester v. Lucy Corp.,* 422 A.2d 918, 920 n. 2 (R.I.1980). That burden cannot be sustained by hearsay or unsworn testimony or when the evidence of such alleged prior use is contradictory. *See* 1 Anderson, at § 6.09; 8A McQuillin, at § 25.188a. The reason for imposing such a heavy burden of proof needed to establish the existence of a nonconforming use is because "[n]onconforming uses are necessarily inconsistent with the land-use pattern established by an existing zoning scheme." *Toys "R" Us v. Silva,* 89 N.Y.2d 411, 654 N.Y.S.2d 100, 676 N.E.2d 862, 865 (1996). "The law * * * generally views zoning cases).

nonconforming uses as detrimental to a zoning scheme, and the overriding public policy of zoning * * * is aimed at their reasonable restriction and eventual elimination." *Id.* A more direct view is that expressed in *Inhabitants of Windham v. Sprague,* 219 A.2d 548 (Me.1966). "Nonconforming uses are a thorn in the side of proper zoning and should not be perpetuated any longer than necessary. The policy of zoning is to abolish nonconforming uses as speedily as justice will permit." *Id.* at 552–53; *see also* § 45–24–39.

■ We observe from the records and exhibits before us that the town's earth removal licensing ordinance became effective on July 2, 1973. It required all then-existing and intended earth removal operations to be licensed, and made unlawful any unlicensed operations sixty days thereafter. We next note that the town's first comprehensive zoning ordinance became effective on May 2, 1977, and the LaCroix property was then placed in an RU–3 rural/residential zone district in which gravel or sand banks and quarries became prohibited uses. We finally observe that the record before us discloses that Marcel did not obtain any earth removal license to operate a sand and gravel operation on his property until September 26, 1985. Consequently, it emerges that from 1973 until September 26, 1985, Marcel had been conducting what appears to have been an unlicensed, and thus unlawful, sand and gravel business on his property. On May 2, 1977, when his property was zoned RU–3 rural/residential, his unlicensed and unlawful use of his property before then could not ripen into a valid nonconforming use. *See O'Rourke,* 103 R.I. at 504–05, 239 A.2d at 180.

### Conclusion

We conclude in this appeal that because the issue raised by the town challenging the existence of the LaCroixes alleged nonconforming use constituted a material issue of fact, the Superior Court motion hearing justice was precluded from acting upon and deciding the parties' respective cross-motions for summary judgment.

That material issue of fact required a full evidentiary and fact intensive inquiry at trial to determine whether, before May 2, 1977, Marcel had been operating a lawfully licensed sand and gravel-earth removal business upon his property. If he had been, then on May 2, 1977, when his property became zoned RU–3 rural/residential, he then could have acquired a valid nonconforming use permitting him to continue to do so, despite the new zoning restrictions, and that nonconforming use would have accompanied his later conveyance of the property to RICO. If he had not been operating a licensed and lawful sand and gravel business on his property before May 2, 1977, when the zoning ordinance became effective, he could not have acquired a valid nonconforming use benefiting the property, and none could have been conveyed to RICO. The proper resolution of that material fact was essential to support the validity of the Superior Court's final judgment on October 4, 1999, that was entered following a trial on the merits of RICO's complaint and the town's counterclaim. Its absence compels us to vacate the October 4, 1999 final judgment order.

Accordingly, for the reasons herein before set out, we vacate the October 4, 1999 final judgment entered in this case and remand the case to the Washington County Superior Court for a new trial, at which time the core issue of the LaCroixes alleged nonconforming use finally can be determined. If found to lawfully exist, its extent and possible expansion then can be

determined in accordance with the guidelines provided by our recent opinion in *Town of West Greenwich v. A. Cardi Realty Associates,* 786 A.2d 354 (R.I.2001).

In light of our remand order, we do not reach the other issues presented to us in this appeal. The papers in this case are to be returned to the Washington County Superior Court for further proceedings in accordance with this opinion.

Chief Justice WILLIAMS did not participate.