[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court is the complaint for declaratory judgment submitted by Plaintiff, Brett C. Lill, along with Ashaway Cement Products, Inc. Ashaway Cement Products (ACP) is the owner of two parcels of land located in the Town of Hopkinton. Mr. Lill has entered a purchase and sales agreement with ACP regarding the two parcels. Plaintiff avers that that there exist a nonconforming use on the parcels and they seek a declaration from this Court that the parking and repairing of trucks and vehicles on the property is consistent with that nonconforming use.
Facts and Travel
The subject property is located at 64 Laurel Street, in the village of Ashaway, Town of Hopkinton, R.I. The property consists of lots 169 and 170 on Tax Assessor's map 24, and is currently owned by ACP. Plaintiff avers that beginning around 1966, the owner of lot 169, (ACP), utilized the property in the manufacture and storage of cement products for wells and septic systems. Plaintiff further avers that this manufacturing operation began prior to the enactment of the Town of Hopkinton Zoning Ordinance (Zoning Ordinance) in 1971. In 1971, the area in which lot 169 is located was zoned rural, residential, farm (RFR-80), and remains so at the present time. Manufacturing is prohibited in areas zoned RFR-80, but consistent with the Town of Hopkinton Zoning Ordinances and G.L. (1956) § 45-24-39, the manufacturing business was permitted as a non-conforming use. In 1973, ACP purchased lot 170, whose use designation was also RFR-80.
In the process of manufacturing these cement products, ACP employed various heavy motorized equipment — including trucks. According to the record, at no time did the number of such vehicles utilized and stored on the property by ACP exceed five. ACP continued to use the property for the manufacture of cement products until 1988; at which time ACP moved their business, citing the need for more storage space. For a brief time, ACP leased the lots to various tenants, however, this practice ceased in 1999 upon notification by the Hopkinton Zoning Official that the practices and operations of these tenants violated the zoning ordinances of the Town of Hopkinton and the legal nonconforming use existing on the property. The property has remained vacant since 1999.
Plaintiff, the owner of Sweetwater Seafood Carriers, Inc., is the prospective vendee of a purchase and sales agreement with ACP on the subject property. Plaintiff desires to utilize the premises for the storage and maintenance of tractors and refrigerated trailers used in the transportation of seafood. Plaintiff's proposed plan indicates that he will store and maintain five trucks and thirteen refrigerated trailers on the property. The purchase and sales agreement is contingent on Mr. Liill receiving approval to conduct the proposed operation.
On May 24, 2001, Mr. Lill submitted an application to the Hopkinton Zoning Officer for a zoning certificate for the proposed principal use of commercial-truck storage and maintenance. In a letter dated May 29, 2001, the Zoning Official, Charles Mauti, informed the appellant that the proposed use is classified under Section 5, Subsection 4 of the Zoning Ordinances as Transportation, Communication and Utilities, articles #421 and #422. The letter also referenced a previous letter, dated August 28, 2000, which informed the attorney for ACP that the primary operation of ACP was "light manufacturing," and "the equipment, trucks, and vehicles used by the business were subordinate to its primary operation: the manufacture and distribution of cement products." This letter made clear that any enlargement, expansion, replacement, or intensification of the non-conforming development shall be allowed only by first obtaining a special use permit.
On July 5, 2001, Mr. Lill filed an appeal with the Zoning Board of Review of the Town of Hopkinton (Zoning Board). Subsequently, on August 20, 2001, the Zoning Board held a hearing on Mr. Lill's petition for review. After hearing the testimony and reviewing the evidence, the Zoning Board, in a decision recorded on Sept. 20, 2001, "upheld" the Zoning Official's decision. The Zoning Board concluded that the proposed principal use of transportation was substantially different from the existing principal use of light manufacturing which incorporated the use of some trucks and vehicles ancillary to that manufacturing. The Zoning Board determined that the proposed use would constitute an enlargement, expansion, replacement, or intensification of the preexisting nonconforming use which could only be obtained by a special use permit.
On Sept. 21, 2001, Mr. Lill filed an appeal with this Court, arguing that the Zoning Board's decision was contrary to the evidence and contrary to the Zoning Ordinance and the Rhode Island General Laws. Subsequent to filing that appeal, Mr. Lill sought a special use permit from the Zoning Board. In a decision recorded April 29, 2002, the Zoning Board denied the special use permit.
On December 9, 2003, Mr. Lill amended his complaint to seek declaratory judgment. Specifically, Mr.Lill prays that this Court declare that there exists a nonconforming use on the "premises" and that the "parking and repairing of trucks and vehicles" on the property is consistent with that nonconforming use. On December 12, 2003 counsel represented to the court that the matter was ready for decision with no need for further testimony.
Jurisdiction and Standard of Review
Rhode Island General Laws Section 9-30-1 defines the scope of the Uniform Declaratory Judgments Act including the scope of this Court's jurisdiction. General Laws Section 9-30-1 states:
 The superior or family court upon petition, following such procedure as the court by general or special rules may prescribe, shall have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree.
The Act is intended to be remedial, and is to be liberally construed and administered. § 9-30-12; See also Berberian v.Travisono, 332 A.2d 121 (R.I. 1975). The purpose of the Act is "to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." § 9-30-12. Seealso Fireman's Fund Insurance Co. v. E.W. Burman Inc.,391 A.2d 99, 101 (R.I. 1978) ("The obvious purpose of the Uniform Declaratory Judgments Act is to facilitate the termination of controversies"). "A declaratory-judgment action may not be used `for the determination of abstract questions or the rendering of advisory opinions.'" Sullivan v. Chafee, 703 A.2d 748, 751
(R.I. 1997) (quoting Lamb v. Perry, 101 R.I. 538, 542,225 A.2d 521, 523 (R.I. 1967)). Thus, a necessary predicate to the exercise of that discretion under the Act is the existence of an actual justiciable controversy. See Providence Teachers Unionv. Napolitano, 690 A.2d 855, 856 (R.I. 1997). Finally, a decision to grant a remedy under the Uniform Declaratory Judgments Act is purely discretionary. § 9-30-6; WoonsocketTeachers' Guild Local Union 951, AFT v. Woonsocket School.Comm., 694 A.2d 727, 729 (R.I. 1997).
This Court initially finds that there exists a justiciable controversy — namely the existence and extent of any nonconforming use. Furthermore, it is clear that a nonconforming use is an alienable property interest and a mere change in ownership does not destroy the nonconforming use. Coventry v.Glickman, 429 A.2d 440, 442 (R.I. 1981). Thus, the uncertainty and insecurity over the existence and extent of this nonconforming use substantially impacts Mr. Lill and the potential vendee of the purchase and sales agreement. Additionally, consistent with the Rhode Island Supreme Court's decision in RICO Corp. v. Town of Exeter, 787 A.2d 1136 (R.I. 2001), the initial determination of a nonconforming use is a proper function of a declaratory judgment action before this Court.[1] This court wades into this water cautiously. While its declaratory judgment authority may be broad, the court is reluctant to usurp or circumvent the express statutory authority of the zoning board.
As indicated above, Mr. Lill originally filed this action as an appeal of the Zoning Board's affirmation of the Zoning Officers evaluation of the nonconforming use. In light of the fact that a "zoning certificate"[2] is nonbinding and only appealable to the Zoning Board when the zoning officer fails to respond under RIGL § 45-24-54, combined with the Supreme Court's guidance in RICO, Mr. Lill amended his complaint to the present declaratory judgment action. On December 12, 2003, all parties waived further arguments or briefs and requested that this Court rely on the prior memorandum and record. Pursuant to Rhode Island Superior Court Rules of Civil Procedure Rule 57, "the court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar." Based on the unambiguous use of the word "may," the decision to accelerate is clearly left to the Court's discretion. In light of Mr. Lill's strong desire for a speedy determination of this issue, the consensus of the parties that a declaratory judgment may resolve the dispute with certainty, and the need for finality, the Court will proceed under its declaratory judgment authority.
Analysis
The Rhode Island Supreme Court in RICO stated that "[a] nonconforming use is a particular use of property that does not conform to the zoning restrictions applicable to that property but which use is protected because it existed lawfully before the effective date of the enactment of the zoning restrictions and has continued unabated since then." RICO, 787 A.2d at 1144;See also 4 Arlen H. Rathkopf, The Law of Zoning and Planning, § 51.01 (1999).[3] Thus, "for a nonconforming use to be sanctioned, it must be lawfully established prior to the implementation of the zoning restriction or regulation." RICO,787 A.2d at 1144; see also G.L. 1956 § 45-24-31(49).
"The burden of proving a nonconforming use is upon the person or corporation asserting the nonconforming use, and that party must prove that the use lawfully was established before the zoning restrictions were placed upon the land." RICO,787 A.2d at 1144; See also Town of Glocester v. Lucy Corp.,422 A.2d 918, 920 n. 2 (R.I. 1980). That burden cannot be sustained by hearsay or unsworn testimony or when the evidence of such alleged prior use is contradictory. RICO, 787 A.2d at 1144-45. The reason for imposing such a heavy burden of proof needed to establish the existence of a nonconforming use is because:
 nonconforming uses are necessarily inconsistent with the land-use pattern established by an existing zoning scheme. The law . . . generally views nonconforming uses as detrimental to a zoning scheme, and the overriding public policy of zoning . . . is aimed at their reasonable restriction and eventual elimination . . . [n]onconforming uses are a thorn in the side of proper zoning and should not be perpetuated any longer than necessary. The policy of zoning is to abolish nonconforming uses as speedily as justice will permit. RICO, 787 A.2d at 1144-1145
(internal citations omitted).
Moreover, a change in use eliminates the exception of the nonconforming use and mandates compliance with the zoning regulations in effect at the time the change in use is made.Hamel Corp. v. Members of Zoning Bd. Of Review, 603 A.2d 303,306 (R.I. 1992). A change of use results when the proposed use is "substantially different from the nonconforming use to which the premises were previously put." Jones v. Rommel, 521 A.2d 543,545 (R.I. 1981). The Rhode Island Supreme Court has stated that "it is impossible to formulate a hard and fast rule as to what constitutes a simple extension of an existing nonconforming use and what is a change of that use. Each case must be considered and determined on its own facts." Santoro v. Zoning Bd. ofReview, 93 R.I. 68, 72 (R.I. 1961).[4]
Finally, under R.I.G.L. 45-24-31(3) an "accessory use," is defined as a "use of land or of a building, or portion thereof, customarily incidental and subordinate to the principal use of the land or building. An accessory use may be restricted to the same lot as the principal use. An accessory use shall not be permitted without the principal use to which it is related." R.I. Gen. Laws § 45-24-31 (3). The term "use" is defined under the Zoning Enabling Act as "the purpose or activity for which land or buildings are designed, arranged, or intended, or for which land or buildings are occupied or maintained." R.I. Gen. Laws. 1956 §45-24-31(60). Consequently, if the use, maintenance, and storage of trucks and vehicles are found to be incidental and subordinate to the primary use of the property, then the use, maintenance, and storage of trucks and vehicles cannot continue absent the primary use. See Harmel v. Tiverton Zoning Bd. Of Review,603 A.2d 303, 307 (R.I. 1992) (an accessory use is permitted as long as it is incidental and secondary to the principal use on the premises).
Thus, Mr. Lill's burden is to show that a valid nonconforming use existed on the subject property at the time the Town of Hopkinton enacted the applicable zoning ordinance, that the proposed use is not substantially different from the nonconforming use to which the premises were previously put, and/or that if the proposed use is an accessory use, the legal nonconforming primary use continues. At the time the Town of Hopkinton enacted the applicable zoning ordinance, ACP is alleged to have been using the property to manufacture cement products, and as part of that manufacture ACP employed various heavy motorized equipment including bulldozers, backhoes, trailers, and dump trucks. That use, if in it fact existed at that time, was a lawful use of the land because the Town of Hopkinton, as yet, had not enacted any zoning ordinances regulating land use in the town. If the proposed use is substantially similar to that valid nonconforming use, then it may continue as a valid nonconforming use.[5] Finally, if the proposed use of the property for the storage and maintenance of trucks and vehicles is merely an accessory use, then it may only lawfully take place in conjunction with the continuation of the nonconforming primary use. See R.I. Gen. Laws § 45-24-31 (3).
This Court initially observes that the records and memorandum before this Court are scant. As stated above, the burden of proving a nonconforming use is upon the person or corporation asserting the nonconforming use, and that burden cannot be sustained by hearsay or unsworn testimony or when the evidence of such alleged prior use is contradictory. The record in this case contains a single affidavit from Charles J. Dipollino, the majority shareholder of ACP, indicating that ACP purchased lot 169 in 1965 and lot 170 in 1973. See Affidavitt of Charles J. Dipollono, Sept. 13, 2000. Charles J. Dipollino avers that the prior occupants of the property manufactured "well tile" on the property. Id. Charles J. Dipollino further avers that in 1965 the site was used by his father, John Dipollino, in the operation of a general contracting business. Id. This general contracting business continued for "several years" and as part of that business, "dump trucks, trailers, backhoes, and bulldozers" were stored and repaired on the site. Id. However, during testimony before the Zoning Board, Charles J. Dipollino stated that "we incorporated [ACP] for the purpose of manufacturing and delivering septic tanks in 1966, and from 1966 on, we continually operated [ACP] as a business of manufacturing and delivering septic tanks." Testimony of Charles J. Dipollino, In Re: Appealto a Decision by the Building and Zoning Officials Decision InRe: Property Located at 64 Laurel Street, (August 16, 2001) ("Transcript"). As part of the business of manufacturing various cement products, ACP utilized trucks to deliver these products to customers. Id. at 39. This Court is unable to determine how long the general contracting business operated on the property. It appears from Mr.Dipollino's affidavit that the contracting business only lasted for a brief time and was replaced with the septic tank manufacturing.
The parties do not dispute that in 1971, the time the Hopkinton Zoning Ordinances were adopted, ACP was utilizing lot 169 for the purpose of manufacturing and delivering cement products. However, there is little mention, let alone evidence, as to the use of lot 170 in 1971. Mr. Dipollino's testimony and affidavit make reference to ACP's use of the "site" and "property," but fails to distinguish between the two lots or to explain how ACP utilized lot 170 in 1971, two years prior to ACP's purchase of that lot. Additionally, in Mr. Lill's memorandum and Mr. Dipollino's affidavit and testimony before the Zoning Board, various general averments regarding the type and use of vehicles utilized and stored on the property over the years were put forth. For example, during testimony before the Zoning Board, Charles J. Dipollino stated that the number of trucks utilized by ACP ranged from one to five. Transcript at 7. However, there is no evidence presented as to the number, type, and use of vehicles stored on the property in 1971. Thus on the evidence before this Court, whether and to what extent a valid nonconforming use exists on lots 169 and 170 cannot be determined. Mr. Lill has not sustained his burden.
Furthermore, there is inadequate evidence as to whether the proposed use is substantially similar to the prior nonconforming use. It appears that Mr. Lill is attempting to show that the prior nonconforming use was both manufacturing of cement products and the storage and maintenance of trucks. However, the parties conflict in their view of this issue. The Hopkinton Zoning Ordinance differentiates between various uses of property. The Ordinances classify trucking under Section 5, Subsection 4 of the Zoning Ordinances as Transportation, Communication and Utilities, articles #421 and #422 — Local and Long Distance Trucking; without and without storage, respectively; and classify cement manufacturing under Section 5, Subsection 3 of the Zoning Ordinances as Manufacturing, Article 3272 — Concrete Products, including block and brick. Again, Charles J. Dipollino, former President and majority stockholder of ACP, testified at the zoning appeal hearing that "we incorporated [ACP] for the purpose of manufacturing and delivering septic tanks in 1966, and from 1966 on, we continually operated [ACP] as a business of manufacturing and delivering septic tanks." However, Mr. Lill's application to the Zoning Board for review of the zoning certificate dated July 5, 2001, indicates that Mr. Lill's proposed use of the premises is for "commercial-truck storage and maintenance." Mr. Lill's application describes the present use of the premises as "commercial-manufacturing, truck storage 
maintenance," and states that "[t]he premises were constructed and used . . . since 1965 for the manufacture and storage of cast concrete well tiles, septic tanks, and other heavy items requiring the use, maintenance, and storage of heavy trucks . . . "As stated above, this Court cannot determine the prior use of the property in 1971. It is possible that the primary use of the property was cement manufacturing and/or commercial-truck storage and maintenance. But it is also possible that the primary use of the property was for the manufacturing of cement products and the commercial-truck storage and maintenance was an accessory use. Thus, Mr. Lill's proposed use may constitute an accessory use, which can only lawfully take place in conjunction with the continuation of the nonconforming primary use. Mr. Lill has failed to submit sufficient evidence for this Court to make these determinations.[6]
Thus, Mr. Lill has failed to meet his burden and this Court cannot grant the plaintiff the relief he requests.[7]
Conclusion
Given the inadequate record, this Court declines to grant Mr. Lill's request for declaratory relief. Mr. Lill has failed to provide sufficient evidence for this Court to exercise its discretionary power to determine the existence or extent of any nonconforming use. Accordingly, plaintiff's complaint is denied and dismissed.
[1] In the case of RICO Corp. v. The Town of Exeter,787 A.2d 1136 (R.I. 2001), the Court held that a zoning board lacks subject matter jurisdiction to determine the existence of a nonconforming use. The Court explained:
 [Z]oning boards are statutory bodies. Their powers are legislatively delineated. They are empowered to hear appeals from the determinations of administrative officers made in the enforcement of the zoning laws and in addition they may authorize deviations from the comprehensive plan by granting exceptions to or variations in the application of the terms of local zoning ordinances . . . Notwithstanding that the enabling legislation does not permit nor the ordinance authorize any additional jurisdiction, the respondent board by purporting to confirm the legality of a pre-existing use in substance assumed to itself the power to issue declaratory judgments. This it had no right to do. Id. at 1144 (citing Olean v. Zoning Board of Review of Lincoln, 101 R.I. 50, 52, 220 A.2d 177, 178 (1966)).
Although the RICO Court did not delineate the extent of this Court's inquest, the RICO Court declared that once a nonconforming use is found to lawfully exist, its extent and possible expansion then can be determined in accordance with the guideline provided in Town of West Greenwich v. A. Cardi RealtyAssociates, 786 A.2d 354 (R.I. 2001). RICO,787 A.2d at 1145-1146. In A. Carti Realty, upon finding that a nonconforming use existed on the property, the Court continued its inquiry into whether the use had been abandoned or legally expanded. See A. Carti Realty Associates, 786 A.2d at 354. Similarly, this Court's inquiry does not end upon determining the existence or extent of any nonconforming use as it existed in 1971. Rather, as described below, this Court continues that inquiry to determine the extent and effect of subsequent changes in that use.
[2] As defined by both the Rhode Island Zoning Enabling Act and the Hopkinton Zoning Ordinances, a zoning certificate is a document signed by the zoning officer acknowledging that a use, structure, building, or lot complies with or is legally nonconforming to the provisions of the zoning ordinance or is an authorized variance or modification. See R.I.G.L. § 45-24-31(65);Town of Hopkinton Zoning Ordinance, § 2(70). The Zoning Official's authority to grant zoning certificates is contained in, and limited by, R.I.G.L. § 45-24-54. R.I.G.L. § 45-24-54
states, in pertinent part;
 In order to provide guidance or clarification, the zoning enforcement officer or agency shall, upon written request, issue a zoning certificate or provide information to the requesting party as to the determination by the official or agency within fifteen (15) days of the written request. (emphasis added)
Under R.I.G.L. § 45-25-54 and Hopkinton Zoning Ordinance § 17, the zoning official, upon written request, shall either issue a zoning certificate or provide information to the requesting party as to the determination of the written request. Furthermore, in the event that no written response is received within fifteen (15) days, the requesting party has the right to appeal to the zoning board of review for a determination. See R.I.G.L. § 45-25-54 and Hopkinton Zoning Ordinance § 17. Therefore, once the Zoning Official complied with his obligation under R.I.G.L. §45-24-54, under the plain reading of the statute and ordinance, the Plaintiff did not have a right to appeal to the Zoning Board.See e.g., Tompkins v. Zoning Bd. Of Review, NC2001-0204 (Hurst, J, October 30, 2003).
[3] R.I.G.L. § 45-24-31(49) of the Rhode Island General Laws defines a nonconforming use as "[a] building, structure, or parcel of land, or use thereof, lawfully existing at the time of the adoption or amendment of a zoning ordinance and not in conformity with the provisions of that ordinance or amendment. Nonconformance is of only two (2) types: . . . (i) [n]onconforming by use: a lawfully established use of land, building, or structure which is not a permitted use in that zoning district. Similarly, in § 2(50) of the Hopkinton Zoning Ordinance, a nonconformance is defined as a "building, structure, or parcel of land, or use thereof, lawfully existing at the time of the adoption or amendment of the zoning ordinance and not in conformity with the provisions of such ordinance or amendment."
[4] Additionally, R.I.G.L. 45-24-40 provides that a zoning ordinance:
 may permit a nonconforming development to be altered under either of the following conditions:
 (1) The ordinance may establish a special use permit, authorizing the alteration, which must be approved by the zoning board of review following the procedure established in this chapter and in the zoning ordinance; or
 (2) The ordinance may allow the addition and enlargment(sic), expansion, intensification, or change in use, of nonconforming development either by permit or by right and may distinguish between the foregoing actions by zoning districts.
The Town of Hopkinton, in enacting their Zoning Ordinance, chose to allow the addition and enlargement, expansion, intensification, or change in use only through a special use permit. See Town of Hopkinton Zoning Ordinance § (8).
[5] "The common-law rule [is] that the right which a nonconforming owner has is only that which existed on the effective date of the ordinance which made the use nonconforming, the limits of which are marked by character, size, and degree of use as it then existed." 4 Rathkopf, The Law of Zoning and Planning, § 73:6 (2001).
[6] This Court notes that Charles J. Dipollino testified before the Zoning Board that trucks were an essential part of ACP's business and were needed to deliver the cement products. Transcript at 39. Without deciding the issue, it appears that these delivery trucks were incidental and subordinate to the cement manufacturing and thus an accessory use — for without the cement manufacturing operation there would be no need for these trucks. However, as already indicated the record is insufficient for this Court to make that determination.
[7] Further, there appears to be some indication in the record suggesting that the prior nonconforming use may have been abandoned. The parties have not argued the issue of abandonment, but, if this were proven, the use currently under consideration would not be entitled to the rights enjoyed thereby. It is axiomatic that a mere discontinuance of a nonconforming use for period does not constitute an abandonment of that use. There must be evidence of an intent to abandon; mere suspension of the activity is not sufficient. A. Carti Realty Associates,786 A.2d at 360; Town of Coventry v. Glickman, 429 A.2d 440 (R.I. 1981); Town of East Greenwich v. Day, 119 R.I. 1, 375 A.2d 953
(1977); A.T. G., Inc. v. Zoning Bd. Of Review of NorthSmithfield, 113 R.I. 458, 322 A.2d 294 (1974); Richards v.Zoning Bd. Of Review of Providence, 100 R.I. 212, 213 A.2d 814
(1965). Nonuse in and of itself is insufficient. To establish abandonment, proof of two factors is required; one intent to abandon and two, some overt act, or failure to act, which would lead one to believe that the owner neither claims nor retains any interest in the subject matter of the abandonment. Washington Arcade Assocs. v. Zoning Bd. Of Review, 528 A.2d 736, 738 (R.I. 1987); Richards, 100 R.I. at 218, 213 A.2d at 817; 1 Anderson, American Law of Zoning § 6.65 at 634 (3d ed. 1986). Furthermore, § 45-24-39(c) provides:
 A zoning ordinance may provide that, if a nonconforming use is abandoned, it may not be reestablished. Abandonment of a nonconforming use consists of some overt act, or failure to act, which leads one to believe that the owner of the nonconforming use neither claims nor retains any interest in continuing the nonconforming use unless the owner can demonstrate an intent not to abandon the use. An involuntary interruption of nonconforming use, as by fire and natural catastrophe, does not establish the intent to abandon the nonconforming use; however, if any nonconforming use is halted for a period of one year, the owner of the nonconforming use is presumed to have abandoned the nonconforming use, unless that presumption is rebutted by the presentation of sufficient evidence of intent not to abandon the use.
Charles J. Dipollino indicated that ACP moved their operation from the property in 1988 and that "[he has] no reason to go back there to manufacture concrete." Transcript at 9. However, he later stated that he had no intention to abandon the property or convert it to another use. Id. Again, the record is insufficient for this Court to make this determination.