DECISION
This matter is before the Court for decision following a bench trial conducted on May 8, May 9, May 15, and May 18, 2007. The parties submitted post-trial memoranda in mid-July.
 Facts and Travel
Defendant Tiverton Yacht Club, Inc. ("Club") first incorporated in 1945 and, in 1956, installed itself in a capacious Victorian dwelling located at 58 Riverside Drive in the Town of Tiverton, Rhode Island. By virtue of the enactment of the town's first zoning code in 1964, declaring the area in question a residential zone, the Club and its *Page 2 
operations became a nonconforming use. Sadly, on June 3, 2003, the beautiful structure housing the yacht club was completely destroyed by a ravaging fire.
The instant litigation was spawned by the granting of a building permit to the Club on December 6, 2006, to reconstruct the clubhouse. Plaintiffs David Campbell, Kathleen Campbell, John H. Moran, Jr., and Eileen M. Moran (collectively "Plaintiffs") contend and seek a declaration from this Court that the permit and attendant building plans, if executed, would produce an impermissible and unlawful expansion and intensification of a nonconforming use. Specifically, Plaintiffs assert as areas of objectionable expansion and intensification the "clubhouse, footprint, the septic capacity, the addition of a marina, the addition of a swimming pool, the addition of interior space, an enlarged kitchen, an increased function capacity, an enlarged parking area, and an intention to go from seasonal use to year-round use." Campbells' Post Trial Mem. at 2-3.
 Standard of Review
In a non-jury trial, "the justice sits as trier of fact as well as law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, he [or she] weighs and considers the evidence, passes upon credibility of the witnesses, and draws proper inferences." Id. "The task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." Walton v. Baird,433 A.2d 963, 964 (R.I. 1981). "It is also the province of the trial justice to draw inferences from the testimony of witnesses. . . ."Id.; see also Rodriques v. Santos, 466 A.2d 306, 312 (R.I. 1983).
"In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law *Page 3 
thereon. . . ." See Super. Ct. R. Civ. P. Rule 52. The Rhode Island Supreme Court has held that in order to comply with this rule, the trial justice need not engage in extensive analysis and discussion. EagleElec. Co. v. Raymond Construction Co., 420 A.2d 60, 64-65 (R.I. 1980). Strict compliance with the requirements of Rule 52 is not required if a full understanding of the issues may be reached without the aid of separate findings. Id. at 64. Even brief findings and conclusions are sufficient as long as they address and resolve pertinent, controlling factual and legal issues. White v. LeClerc, 468 A.2d 289, 290 (R.I. 1983).
Furthermore, the Uniform Declaratory Judgment Act, R.I. Gen. Laws § 9-30-1 et seq., grants the Superior Court "power to declare rights, status, and other legal relations whether or not relief is or could be claimed." Section § 9-30-12 provides that the Uniform Declaratory Judgment Act should be "liberally construed and administered." This Court finds the Plaintiffs' request for such relief to be appropriate under the Uniform Declaratory Judgment Act.
 Evidence
Plaintiff Kathleen Campbell, a lifelong resident of Tiverton and neighbor of the yacht club since 1994, commenced her affiliation with the Club in the early 1970s when she was six years of age. During the summer months and until the end of that decade, she visited the yacht club each weekday for swimming and sailing lessons, or to go to the beach across the street. Although children were not welcome in the clubhouse, they were permitted indoors on rainy days to play ping pong or take instruction in knot-tying. The two dozen Cape Dory and Sunfish boats were of a portable variety. There was no swimming pool, but there was a swim float in the Sakonnet River, south of the T-dock. *Page 4 
The rear yard of the clubhouse was never used and no vehicles could park there due to the presence of tree stumps and bushes. The only vehicles regularly appearing on the property belonged to Red Walsh, the caretaker who resided on the third floor, and "Mike," the cook, who would pull his station wagon alongside the kitchen area to unload his supplies. Mrs. Campbell characterized the use of the clubhouse and facilities as purely seasonal and denied having any knowledge of holiday gatherings (e.g. Christmas, Valentine's Day, St. Patrick's Day) being convened during the winter months.
Plaintiff David M. Campbell echoed his wife's testimony regarding the seasonal use of the yacht club premises and the nature of that use. In the fall of 2002, Mr. Campbell was approached by the Commodore of the Club, Mark Levin, who indicated that the Club was considering making a claim of right against property maintained by the Campbells in order to increase its parking capacity. This discussion prompted Mr. Campbell to investigate the Club's various permit applications. The resultant research caused him to conclude that the Club was noncompliant with its Department of Environmental Management ("DEM") septic permit, its Coastal Resources Management Council ("CRMC") marina permit, and the applicable zoning ordinances.
Mr. Campbell articulated the objectionable areas of expansion and/or intensification as:
 "(a) increasing the septic system from 525 gallons per day to 1,615 gallons per day to support the illegal marina operation; (b) year round use of the clubhouse despite a history of seasonal use; (c) parking behind the clubhouse where parking had not previously been permitted; (d) a bigger clubhouse with more interior space and greater capacity; (e) a bigger foundation and a bigger footprint." *Page 5 
Campbells' Post Trial Mem. at 5. He also opined that the clubhouse, swimming pool,[1] and garage covered more than twenty-five percent of the lot, clearly in violation of the fifteen percent coverage allotted under the town's zoning ordinance.
Co-Plaintiff John H. Moran, Jr., a commercial marine broker, testified that he purchased the property neighboring the yacht club to the north in early 2003. However, he had been around the property his entire life since his lot previously had been owned by his grandmother. He stated that the use of the clubhouse was seasonal and the Club was compelled to cease operation in late October/early November because the building was unheated and, thus, water service was terminated.
Mr. Moran and his father actually tape measured the clubhouse's remaining foundation in January 2004. However, the measurements were taken from the inside of the foundation, not the exterior perimeter.
Mr. Matthew A. Moran ("Matthew"), a cousin of John H. Moran, Jr., lived at 38 Riverside Drive, year round, from 1966 to 1991, when he moved to Block Island. He testified that his "career" at the yacht club began in 1972 when he was six years of age. As a child, he had a fascination with flags and implored Red Walsh to allow him to assist in the hoisting and lowering of the flags on the Club's flagpole. From 1972 to 1989, Matthew was present on the property on a daily, seasonal basis. In 1984, he actually became a paid employee of the Club, having received an "appointment" as a steward/cook. Matthew opined that sometime after the installation of the swimming pool in 1987, and the marina in 1988, the Club began to morph from a "small family beach *Page 6 
club" into "something like the Ida Lewis Yacht Club." He explained that the members desired their club to be a venue for Performance Handicap Rating Formula cruising.
Mr. Gareth Eames, the Tiverton Building Inspector who issued the permit in controversy, acknowledged that because the yacht club is a nonconforming use, "it can only be rebuilt as it existed prior to the zoning enactment." He did not know what parking existed on-site in 1963 and made no "parking calculations" in connection with the instant permit.
Plaintiffs' expert witness, Kamal Hingorany, a professional land surveyor and civil engineer, is also a Title III licensed septic system designer. He opined that the proposed septic system for the yacht club would be within two hundred feet of the Sakonnet River's mean high water mark, thus requiring a special use permit from the town.
The proposed installation is clearly an enlargement of the former system and designed to support a more intensive use. Specifically, the footprint of the new system is 2.26 times larger than the old system, viz., two hundred sixty nine square feet versus one hundred square feet, respectively. The old system was designed to accommodate thirty five people using fifteen gallons per person for a total daily flow of five hundred twenty five gallons. The new system is designed to accommodate one hundred seventy four persons using the yacht club and slips, plus twenty five swimmers, for a total of one hundred ninety nine individuals with daily gallonage of one thousand six hundred fifteen. An additional significant difference in the new design is its use of a concrete diffuser which will allow vehicles to pass over the surface. The area of the old system was not designed to support such weight. *Page 7 
The testimony of the Club's first witness, attorney Ray Holland, actually conformed to that of Plaintiffs' witnesses. He, too, recalled an essentially seasonal use with occasional holiday dinner dances on Columbus Day, New Year's Eve, and St. Patrick's Day. His familiarity with the yacht club ceased in 1971 when he and his wife moved. At that time, the predominant boat in use was the fourteen foot single mast "candy" boat used in competitions which were observed by the race committee from the clubhouse's second deck.
Mr. John Brady, a retired mechanical engineer, was and is a member of the Club from 1965 to 1975 and 1985 to present, respectively. In 1965, Mr. Brady owned a 22.5 foot sloop, and the thirty candy boats were moored in a basin west of the yacht club property. He noted that, in 1970, the clubhouse's first floor porch was expanded, but the building's footprint remained unchanged. He, too, testified to social gatherings offseason at Halloween, Harvest Time, Christmas, New Year's Eve, and St. Patrick's Day.
Mr. Brady's testimony was illustrative of the tension and hostility which has developed between the Club's members and Plaintiffs. In a 2004 letter to the editor of the Sakonnet Times, Brady alleged that he was assaulted by John Moran after parking his car on Holden Way, the right-of-way presently in controversy in separate litigation, "to indicate [the Club's] contention that it is not owned by the Morans."Ex. 52. He characterized the incident as "the latest event in a long series of harassments by the neighbors to the north and south of the Tiverton Yacht Club." Id. He indicates within his letter that the Club intends to "keep the building's first floor footprint the same as before but would like to have a full basement . . .[2] [,] [s]o [it] can store . . . small boats there in *Page 8 
the winter." Id. He adds that "since our neighbors object, the [building] inspector is pressuring us to change our plans. How ridiculous can it get?" Id.
Mr. Peter Franklin, the Club's next witness, has been affiliated with the Club since 2000 as both a former Commodore and member of the Board of Directors. He also recalled social events being held at the clubhouse around Christmas, Valentine's Day, New Year's Eve, and St. Patrick's Day.
The Club's final witness, William Anthony Platt, a draftsman and member of the yacht club since 2006, testified that it was "hard for [him] to answer whether the full foundation for the new building is bigger. We do not truly agree what [equals] the footprint."
 Law and Analysis
The Tiverton Code of Zoning Ordinances provides, in pertinent part, as follows:
 "[s]hould a legal nonconforming structure, or nonconforming portion of a structure, be damaged by an accident or act of God to an extent of more than 51 percent of its replacement cost at the time of damage as determined by the zoning officer, it shall be given one year in which to commence rebuilding, repairing or replacing the damaged structure. If such action is not taken within said one-year period, then it shall not be rebuilt, repaired or replaced except in conformity with the provisions of this ordinance."
Art. XIV, Section 4(b).
In relevant part, Article XIV, Section 5 states:
 "a. A legal nonconforming use of any parcel of land shall not be extended beyond that portion of the lot thus used, or otherwise expanded, unless a use variance is granted pursuant to the provisions and standards set forth in article XVII.
 * * * *Page 9 
 c. A legal nonconforming structure as to use shall not be added to or enlarged unless a use variance is granted pursuant to the provisions and standards set forth in article XVII.
 d. A structure which is nonconforming by dimension only shall not be added to or enlarged unless a dimensional variance is granted pursuant to the provisions and standards set forth in article XVII."
Clearly, the Tiverton Code of Ordinances prohibits the extension and/or enlargement of nonconforming uses and nonconforming structures. Thus, the pivotal inquiry in the instant case is whether the Club's proposal to reconstruct a new facility and the potential use-intensification thereof impermissibly violates the town's regulatory ordinances and applicable case law.
Our State's General Assembly has defined "nonconformance" in the context of municipal land use regulation as "[a] building, structure, or parcel of land, or use thereof, lawfully existing at the time of the adoption or amendment of a zoning ordinance and not in conformity with the provisions of that ordinance or amendment." R.I. Gen. Laws §45-24-31(49); see also Duffy v. Milder, 896 A.2d 27, 38 (R.I. 2006). Our Supreme Court has imposed a "heavy evidentiary burden on one who asserts a nonconformance use because nonconformance uses are necessarily inconsistent with the land-use pattern listed by an existing zoning scheme." Duffy, 896 A.2d at 26 (citing Rico Corp. v. Town ofExeter, 787 A.2d 1136, 1144 (R.I. 2001)). Furthermore, the Court has "subscribed to the view that a lawful nonconformance use is `a thorn in the side of proper zoning and should not be perpetuated any longer than necessary. The policy of zoning is to abolish nonconformance uses as speedily as justice will permit.'" Rico Corp., 787 A.2d at 1145.
Courts must strictly construe the scope of nonconforming uses because they are viewed as detrimental to the zoning scheme, and the overriding public policy of zoning is *Page 10 
aimed at their reasonable restriction and eventual elimination.See Roland F. Chase, Rhode Island Zoning Handbook § 85 (2d ed. 2006) (citing Town of Richmond v. Wawaloam Reservation, Inc., 850 A.2d 924
(R.I. 2004); Duffy, supra). This tenet applies to both dimensional nonconformance and use nonconformance.
The term "nonconforming by dimension" is defined in the Zoning Enabling Act of 1991 as a "building, structure or parcel of land not in compliance with the dimensional regulations of the zoning ordinance. Dimensional regulations include all regulations of the zoning ordinance, other than those pertaining to the permitted uses." R.I. Gen. Laws § 42-24-31(49)(ii). "Thus zoning regulations pertaining to lot size, setbacks, building heights, and parking are encompassed within this definition . . ., and, [the act] does not appear to offer any protection for non-dimensional non-conformities as such." Chase, supra at § 87. As noted by another commentator:
 "[t]he same two philosophical concepts that have been used and support the prohibition against changing one nonconforming use to another are relied upon to sustain the customary ordinance restrictions against the enlargement or extinction thereof. One is that the only nonconforming use entitled to protection is the one which existed at the time of passage of the ordinance which made it nonconforming; the other is the public policy which is said to require the termination of nonconforming uses as speedily as possible."
4 Rathkof, The Law of Zoning and Planning § 73:14 (2005).
However, courts also have drawn a:
 "distinction between the enlargement or extension of non-conforming uses and an intensification of such lawful uses. An increase in floor space either arising from an addition to an existing building or in a separate building; an increase in the area in a lot used for non-conforming uses or a change in business methods or the provision of new accessory facilities with the resulting extension of the use involved have all been held to be proposals for the enlargement of non-conforming use. Conversely, an increase in the volume of an existing business is usually referred to as intensification rather than an enlargement and such intensification has *Page 11 
been permitted under a valid non-conforming use. A distinction is sometimes made between extension and enlargement with the former referring to increased use of existing floor area within a building and the latter to the construction of a larger building."
Prince George's County v. E.L Gardner, Inc., 424 A.2d 392 (Md.App. 1981) (citing 4 Williams, American Land Planning Law §§ 113.01 113.06 (1975, 1979 Cum. Supp.)), rev'd, 443 A.2d 114 (Md. 1982). "Ordinarily, [an] increase in the volume or intensity of use, to be prohibited, must be substantial in nature such as to constitute an illegal change, extension or expansion of the nonconformance use." Rathkopf,supra at § 73.15.
Plaintiffs' objection to the potentiality of the Club's use being expanded from seasonal to year-round requires a recounting of the historical use of the clubhouse during the winter months since its establishment in 1956. The first available log, entitled "Tiverton Yacht Club, Social and Racing Log," reveals that as early as 1959, the Club organized — with members and chairpersons appointed — social events outside the summer season. See Ex. 47. For example, in 1959, the following events were held: Valentine's Day Dance on February 14; St. Patrick's Dance on March 14; Spring Dance on April 18; Shipwreck Dance on September 26; Halloween Dance on October 31; and New Year's Eve Dance on December 31.
Logs introduced into evidence demonstrate that these or similar events were held in 1967 (with the addition of a Building Fund Dance in November); 1968 (with the addition of a Launching Party in late April and another Building Fund Dance in November); 1969 (with the addition of a Harvest Dance in November); 1972; 1974 (however, no events were held between the November Dance and Valentine's Day Dance); 1975 (with the addition of a wine tasting party on January 25); 1976 (no events between the Halloween Party and a Pot Luck Supper on March 21); 1977 (with the *Page 12 
addition of "Old Timers' Night" in November); 1979 (however, no events were held in January and February); 1980 (with events between September 1 and May 3 to be announced); 1989 (no winter events); 1981 (no winter events); 1983 (no winter events); 1985 (no winter events); 1986 (no winter events); 1988 (no winter events); 1990 (last event of the season, "Putting on the Ritz," held on October 13); and 1999 (with a Black Tie New Year's Eve Party held on December 31). See Ex. 47 48.
The final logbook proffered into evidence was published after the June 3, 2003 fire. See Ex. 32 at Insert 2. It notes on its social agenda — off season — a Children's Christmas Party for December 21. Of course, due to the destruction of the clubhouse, the club members could not be expected to organize the customary social events which were a part of their historic tradition. However, the 2003 logbook offers the clubhouse and pool for rent and specifies various fees depending on whether the lessee is a member or non-member and whether the event is catered or non-catered. See Logbook at 23.
The Club's by-laws cap membership at two hundred "paid members," any excess requiring the creation of a waiting list. See Art. IV, Section7. Yet, the 2003 membership roster lists three-hundred fifteen members, in addition to their children. Logbook at 26-47. On its website — approximately one month after the fire — the Club characterizes itself as "a small but active club, with a friendly, family-like atmosphere."Ex. 32. The Club also stated that it has "21 slips and 8 moorings available for members" and reiterated that "[c]lub size is limited to 200 memberships."
A conversion of the clubhouse from seasonal use to consistent daily, year-round use is clearly impermissible. See Town of Oyster Bay v.Avalon Yacht and Cabana Club, Inc., 329 N.Y.S.2d 185 (N.Y.App.Div. 1971). In Avalon, the Court found factually that *Page 13 
a beach club (mainly its restaurant) had been "substantially enlarged" when it was converted from "seasonal, private club use, to year round, public use." The Court specifically ruled that "any enlargement of the [nonconforming use] in time, manner or space" which was "not identical" to that formerly existing must be enjoined." Thus, in the instant case, the "off-season" use of the clubhouse must be restricted to the monthly holiday/harvest/spring social gatherings chronicled in the logbooks.
Additionally, offering the clubhouse for event rental — whether to members or non-members — is absolutely prohibited as it constitutes an additional commercial use. Likewise, leasing activities are tantamount to a "new business undertaking and a substantial . . . departure from the original nature and purpose of the legal nonconforming use."Town of Lebanon v. Craft, 529 A.2d 1328, 1332 (Conn.App.Ct. 1987) (holding that renovation of cottages and year-round rental of same was an illegal extension of a nonconforming use). The aforementioned principles likewise constrain the Club from renting slips and moorings to non-members except for individuals who are members of other clubs with which it shares reciprocity.
The term "enlargement" in the context of the law of nonconforming uses obviously also pertains to the physical dimensions of the previously existing structure. Even if the linear extent of the building was not increased (and here, as proposed, it would be), "[a]ny modification of or addition to a building that would increase the square footage of nonconforming space within the building . . . does not make the building more conforming." Lewis v. Town of Rockport, 712 A.2d 1047, 1050 (Me. 1998). Thus, a *Page 14 
clubhouse erected beyond the original's footprint,[3] or containing additional interior space, would be an illegal structure.
Vertical enlargement of a nonconforming structure, as well as the installation of a foundation over a crawl space, also have been held to constitute impermissible extensions. See County of Lake v.Courtney, 451 N.W.2d 338 (Minn. 1990); see also Two Lights Lobster Shackv. Town of Cape Elizabeth, 712 A.2d 1061 (Me. 1998). In LobsterShack, the appellant nonconforming restaurant sought to construct a foundation to protect "the structural integrity of the building and to provide additional storage space for the business." Even though the Shoreland Zone's regulations did not prohibit the construction, the Court held that the zoning ordinance forbade the extension of the "nonconforming use into the basement area created by the new foundation."
Likewise, in the instant case, the fact that DEM approved the Club's installation of a septic system within two hundred feet of the annual high water mark of the Sakonnet River, a coastal feature, in no way extinguishes the town's zoning mandate of the necessity of a special use permit for the project.
Although, there is evidence before the Court that the Club presently has twenty one slips along with eight moorings, and had seventeen slips in 1988, there is no evidence of what, if any, slips and moorings it had when it became a nonconforming use. There is evidence in the record of the historical presence of certain floating docks, swim rafts, and a dock for transient use, but there is nothing in the record specifying their dimensions and/or any alterations. The record reveals that the Club applied to CMRC in 1988 to install two new six-foot by thirty-foot floats and two new six-foot by twenty-foot *Page 15 
floats. See Ex.32 at Insert B. Based on the current state of the evidence, it is not possible, without remand for further hearing, for the Court to fairly determine the extent of marina use the Club is entitled to. As indicated previously, the Club is precluded from engaging in commercial usage of the marina and/or expanding the marina.
A change in the "quality or character" of a marina as well as the "degree of its use" has been held to constitute an unlawful expansion of a nonconforming use. See Brady v. Board of Appeals of Westport, 204 N.E.2d 513 (Mass. 1965). In Brady, at the time the boat yard became a nonconforming use in a residential district:
 "there were four or five boats associated with the premise . . . moored . . . or tied to a 12 foot pier. There was also a catwalk extending from the shore. Three of these boats were skiffs and one or two were cabin cruisers, the owners of which were charged a fee for the use of the premise. . . . If any boat repair work was [done], it was of a very inconsequential nature. . . . A barge measuring 28 x 90 feet used as a docking facility was permanently affixed to the shore. . . . Two piers, one 90 feet long, and 10 feet wide, and the other 80 feet long were erected. A house was provided for business invitees to enjoy refreshments and cooked meals. . . . A fee was charged for docking or mooring."
Id. at 519 n. 5.
Finally, the record is completely devoid of any evidence or testimony to support a finding that parking occurred and/or was permitted behind the Clubhouse. Thus, the proposed lot in that area is, incontrovertibly an impermissible expansion of a nonconforming use. See Raymond v. Cityof Norwalk, 820 A.2d 274, 298 (Conn.App.Ct. 2003) (holding that increasing the number of parking spaces by changing from a parallel to a diagonal scheme constitutes an impermissible intensification of use). *Page 16 
Counselors for the Plaintiffs shall prepare an order in conformance with this decision.[4]
[1] Mr. Campbell testified that he is not requesting the Court to order removal of the swimming pool, as it has been there for twenty years and his predecessor in title did not appeal its installation.
[2] The old building had a bulkhead crawl space.
[3] The footprint is the exterior perimeter of the foundation. Plaintiff Moran testified that he derived his measurements from the interior and, thus, those measurements cannot be accepted. Plaintiffs reference the Court to the tax card dimensions, but Plaintiffs' own expert testified that the cards are an unreliable source.
[4] The Club's motion to dismiss on the grounds of jurisdiction, justiciability, and standing is denied. See Town of West Greenwich v.Carde Realty Assoc., 786 A.2d 354 (R.I. 2001); Rico Corp. v. Town ofExeter, 787 A.2d 1136 (R.I. 2001).